MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, Respondent, *v.* LOU GRIESENBECK, Appellant.

First Department, July 6, 1967.

*Pieter J. Kooiman* of counsel (*Abraham Kaufman* with him on the brief; *Abberley Kooiman Amon Marcellino & Clay,* attorneys), for appellant.

*Walter G. McNeill* of counsel (*Louis B. Eten* and *James B. May* with him on the brief; *Brown, Wood, Fuller, Caldwell & Ivey,* attorneys), for respondent.

BOTEIN, P. J.  The controversy between the parties stems from transactions which took place while plaintiff was a member firm of the New York Commodity Exchange, Inc., and defendant an individual member thereof, although he later gave up his membership. Section 232 of the Exchange by-laws requires arbitration of any " claims, dispute, difference or controversy " between a member and a member firm " arising out of any transaction in commodities made on the Exchange ". As defendant's broker and for his account plaintiff engaged in transactions on the Exchange and on the London Metal Exchange, and by this action seeks to charge defendant with the ensuing losses. Defendant disputes plaintiff's authority to enter into the London transactions for his account and moved for an order dismissing the complaint pursuant to CPLR 3211 (subd. [a], par. 5), and compelling arbitration pursuant to CPLR 7503 (subd. [a]). Special Term viewed the dispute as not within the scope of section 232, and from its order entered February 15, 1967 denying the motion defendant appeals.

In November, 1965 defendant had maintained a margin account with plaintiff, as broker, for trading in commodities.

Under the "commodity account agreement" which defendant signed, plaintiff was given the right, whenever in its discretion it considered it necessary for its protection, to sell any commodities in the account, or to buy any commodities which might be short in the account; "and any such sales or purchases may be made at your discretion on any exchange or other market where such business is then usually transacted". On November 18, 1965, and while plaintiff held for defendant's account 10 copper futures contracts which had been purchased on the Exchange, plaintiff called for additional margin because of a drastic drop in the price of copper on the Exchange. Defendant was unable to comply with the call and was told by plaintiff's representative, Ross E. Rowland, Jr., that "his commitments on the Exchange would, therefore, have to be liquidated". Liquidation was thwarted, however, by the fact that there were no buyers at the lowest price at which it was permissible to sell copper on the Exchange on November 18, 1965. On the same day plaintiff sold 10 copper futures contracts short on the London Metal Exchange for defendant's account. On the next day defendant's long position on the Exchange was able to be and was liquidated (at a loss to defendant which he does not dispute), whereupon plaintiff covered defendant's short position in London by making offsetting purchases there for his account.

The purpose of the London transactions, as explained in Rowland's affidavit, was that "a sale of copper on the London Metal Exchange might protect against further loss if the price of copper on the London Metal Exchange moved in line with the price on the Exchange; if prices on both markets declined, the increasing loss on the Exchange contracts would be offset by the gain on the London Metal Exchange contracts." The desired gain on the London contracts did not materialize, however; on the contrary, the covering purchases in London were made at prices resulting in a loss far exceeding that suffered from the liquidation on the Exchange.

Defendant set forth his version of the facts relating to the London trades in a letter to plaintiff dated December 23, 1965:

"At the close of the copper ring on November 17th I was long 2 contracts of January, 2 of March and 6 of May. The following morning I received a call from Ross, through your private wire terminating in the booth of Felix Forlenza, advising that the New York market would probably be down the limit and that your company thought it advisable to sell a like tonnage in the London market. I informed him that I would consider this and call back, which I did within the next few minutes. During this conversation I informed Ross that I thought it was very danger-

ous to sell London against New York in light of the Rhodesian U.D.I., but if it was your decision to do so I had no means of influencing you one way or the other. You must keep in mind that your house rule is that if a customer does not meet a margin call that you are free to sell him out in the current market, which I presume to mean COMEX. Under the circumstances I did not believe that I had any choice but to rely on you to do whatever was legally permissible, and I so informed him. During the day I was informed that 10 lots had been sold for my account.

" There is still a serious doubt in my mind as to whether your actions were legally empowered under the rules of the Exchange to sell a customer's long position on the COMEX in a foreign market and hold him responsible for the market differences. This is the question that must be resolved before I can make any arrangements for the liquidation of the loss of $31,801.68 which resulted from this transaction."

The affidavit by Rowland details plaintiff's version of what happened after the failure to comply with the margin call. According to Rowland, he agreed on behalf of plaintiff that defendant and one Forlenza, a floor broker, should handle the required liquidation of defendant's holdings on the floor of the Exchange at the market. When the inability to sell the copper on the Exchange transpired, defendant asked Rowland what defendant could do. Rowland consulted three other persons in plaintiff's employ, and the " suggestion was made " about selling in London for the purpose above described. Rowland then telephoned defendant and " explained the possibilities of selling copper on the London Metal Exchange and in that way seek to protect himself from further loss." Defendant, Rowland states, understood the risks involved, " knew that the grade and weight of copper traded on the London Metal Exchange was different from that under his Exchange contracts, that the delivery dates were different, and that the price of copper on the London Metal Exchange might not move in the same direction as the price on the Exchange." Defendant " agreed that selling copper on the London Metal Exchange was appropriate. He then authorized me to sell copper on the London Metal Exchange for forward delivery, namely, to enter into ten contracts thereon for his account and risk and to buy back the copper sold on the London Metal Exchange as soon as Merrill Lynch was notified that he was able to liquidate his commitments on the Exchange."

In May, 1966, evidently after some discussion regarding arbitration, plaintiff informed defendant that in its view the dispute was not subject to arbitration under the by-laws of the Exchange " since the dispute concerns only transactions on the London

Metal Market." Plaintiff then addressed an inquiry to the arbitration committee of the Exchange, receiving a reply from counsel for the Exchange indicating that the matter was not subject to the jurisdiction of the committee. Nevertheless, after commencement of this action, defendant filed a "submission to arbitration" with the arbitration committee. That body, after hearing the parties, unanimously determined that the controversy "is within the scope of Section 232 of the By-Laws" and directed that arbitration proceed (but has permitted postponement pending the outcome of defendant's motion). Plaintiff was consistent in its objection that section 232 was inapplicable, and it was entitled to press the point before the committee without thereby waiving it (*Matter of Hesslein & Co. v. Greenfield*, 281 N. Y. 26, 33). We find no indication in the record that plaintiff had agreed to be bound by the committee's determination, nor can we accept defendant's contention that the determination became binding because the committee was empowered to interpret the Exchange's procedural rules governing arbitration.

Our own conclusion, however, accords with that of the committee. The nexus between the New York trading and that in London was sufficiently direct; we think it evident that the latter arose from, was a proximate outgrowth of, the former. Every margin transaction on the Exchange creates rights in both parties, and a dispute as to whether steps taken off the Exchange are consistent with those rights is properly said to arise from the transaction on the Exchange. "Parties to a contract may agree, if they will, that any and all controversies growing out of it in any way shall be submitted to arbitration," may "clothe the arbitrators with power to settle every difference having its genesis in the contract" (*Matter of Merchant v. Mead-Morrison Mfg. Co.*, 252 N. Y. 284, 298, 300). Where Exchange members engage in a valid transaction on the Exchange and their subsequent acts which raise issues of fact or law can rationally be said, as here, to have their genesis in that transaction, the broad compass of the Exchange by-law evidences an intention that arbitration should be the exclusive procedure[1] (cf. *Matter of Lipman* [*Haeuser Shellac Co.*], 289

---

1 The "claims, dispute, difference or controversy * * * arising out of any transaction in commodities made on the Exchange" which section 232 of the by-laws subjects to arbitration are stated in the section to include "claims, disputes, differences or controversies relating to contracts for the physical commodity in an E. F. P. transaction as same is defined in Rule 504." There is force in defendant's contention that the concurrent and apparently interchangeable use of "arising out of" and "relating to" signifies a purpose to achieve an arbitration provision of full scope.

N. Y. 76, 80; *Matter of Terminal Auxiliar Maritima* [*Winkler Credit Corp.*], 6 N Y 2d 294, 296, 298).

Resistance to arbitration is also grounded on the fact that defendant sold and transferred his Exchange membership in December, 1965, after the transactions in controversy but before he filed his submission to arbitration. Section 208 of the by-laws, which requires the posting for a period of 10 days of a notice of intention to transfer, provides that after the expiration of the period "all of the rights and privileges of the member shall cease." We need not consider whether this section, if it stood entirely alone, would vitiate the submission (cf. *Matter of Langer* [*Speyer*], 19 A D 2d 602, affd. 14 N Y 2d 642), since other sections clearly provide for arbitration by failed members and the legal representatives of deceased members, and it seems unlikely that a different result was intended in the case of a withdrawing member.

As there has yet been no arbitration and award, present dismissal of the complaint is not authorized (*Langemyr* v. *Campbell*, 23 A D 2d 371, 373, 374; 4 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 3211.33).

Accordingly, the order entered February 15, 1967, should be modified, on the law and the facts, to direct that the parties proceed to arbitration, and otherwise affirmed, with costs and disbursements to defendant. Settle order on notice.

McGIVERN, J. (dissenting). I dissent and would affirm the order of Special Term.

Not only is the dispute not within section 232 of the New York Commodity Exchange by-laws, the appellant himself has ceased to be a member of this Exchange and thus he no longer has the status (as a member) entitling him to urge that the disputed transaction on the London Metal Exchange is arbitrable.

Section 232 of the by-laws of the New York Exchange is clear when it dictates that any "claims, disputes, differences or controversies" between a member and a member firm "arising out of any transaction in commodities *made on the Exchange*" shall be subject to arbitration. (Emphasis supplied.)

The Commodity Account Agreement between the plaintiff and the defendant reads: "Any and all transactions shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market (and its clearing house, if any) *where executed.*" (Emphasis supplied.)

And subdivision (a) of section 208 of the by-laws of the New York Exchange states: "After the expiration of the ten days posting of notice of intention to transfer, all of the rights and privileges of the member shall cease."

It would seem to be the position of the majority that these regulations do not mean what they say when they say it.

It is urged that a literal construction should not be given section 232 because the losses incident to the short sale on the London Metal Exchange were the result of calculations relating to transactions on the New York Commodity Exchange. *Ergo*, it is argued, they " arose " and were a " proximate outgrowth " of the latter. We know the purpose of the short sale on the London Exchange was to hedge and limit the losses already suffered on the New York Exchange. But this is motivation only. It explains what took place. The place where the sale was executed, however, was the London Metal Exchange. It was there that the plans went awry, in a foreign market on a foreign Exchange subject to its own separate and unique rules, regulations, customs and usages.

The defendant, a professional trader, would now arbitrate this London transaction, which he now repudiates, before an Exchange (New York) of which he is no longer a member. Counsel to the Arbitration Committee of the Exchange also was of the opinion the dispute could not properly come before it. In his letter of June 2, 1966, addressed to appellant, he wrote: " Your letter would appear to indicate that the controversy which you have with Merrill Lynch involves only their right to put out a hedge on the London Metal Exchange. If I am correct in this understanding of the nature of your dispute, the matter would not be subject to the jurisdiction of the Arbitration Committee of the Exchange."

In this same letter, the counsel opined: " The By-laws of the Exchange provide for the submission to arbitration under the Rules of the Exchange any controversy between a member and non-member ' arising out of a transaction on the Exchange '. This Rule does not enable a non-member to compel a member to submit to arbitration. It is permissible, however, for a member and a non-member, by mutual agreement, to submit a controversy to arbitration if it involves a transaction on the Exchange."

In my view, the transaction in dispute was neither one which the respondent agreed to arbitrate nor was it one involving a transaction on the New York Exchange. And herein, there is no other basis for compelling arbitration. (See *Sinva, Inc.* v. *Merrill, Lynch, Pierce, Fenner & Smith,* 253 F. Supp. 359, 364–365 [U. S. Dist. Ct., S. D. N. Y., 1966].)

At the time appellant sought to submit his controversy to the New York Exchange he had ceased to be a member for a period of nine months. Indeed, he relinquished his membership on

December 2, 1965, one day after the disputed transaction in London. The effort of the majority to analogize this situation with one involving an insolvent or a deceased member is based on a gratuitous assumption. The by-laws of the Exchange (*supra*) expressly declare that all his (the defendant's) privileges and rights cease 10 days after he posted his intention to transfer his membership. And there is nothing further in the by-laws that would resuscitate his privileges or bring back to life his right to compel the respondents to submit to arbitration a question they have steadfastly resisted. Having resigned as a member of the New York Exchange, appellant lost every right and privilege he might otherwise have had to compel the respondent to arbitrate the London transaction (*Matter of Langer* [*Speyer*], 19 A D 2d 602, affd. 14 N Y 2d 642).[2]

The order of Special Term should be affirmed.

STEVENS, TILZER and MCNALLY, JJ., concur with BOTEIN, P. J.; MCGIVERN, J., dissents in opinion.

Order entered February 15, 1967, modified, on the law and the facts, to direct that the parties proceed to arbitration, and otherwise affirmed, with $50 costs and disbursements to defendant.

Settle order on notice.

---

2 Nor do I accept as valid the endeavor of the majority to integrate the second portion of section 232 which makes arbitrable " controversies relating to contracts for the physical commodity in an E.F.P. transaction as same is defined in Rule 504" into the much narrower scope of permissible arbitrations under the first portion of section 232. And only the first portion of this section can support jurisdiction to arbitrate. The words following " or " are plainly disjunctive and unrelated to the nature of the instant dispute. It is of vaster significance that the first portion of section 232, which alone can sustain the plaintiff's position, does not contain the words " or relating thereto ". And this phrase, here missing, is found in the standard arbitration clause recommended by the American Arbitration Association. It is not here present.