Barbara BROWN, Plaintiff,

v.

GILLIGAN, WILL & CO., and the seller of 100 shares of Common Stock of Westec Corporation through Gilligan, Will & Co. as broker for such seller to Barbara Brown through Burnham and Co., as broker on August 24, 1966 at a price of $48⅝ per share, the name of such seller being unknown, Defendants.

GILLIGAN, WILL & CO., Defendant and Third-Party Plaintiff,

v.

COHN, DELAIRE & KAUFMAN, Third-Party Defendant and Fourth-Party Plaintiff,

v.

EASTMAN DILLON, UNION SECURITIES & CO. and Delafield and Delafield, Fourth-Party Defendants.

No. 67 Civ. 3201.

United States District Court
S. D. New York.

May 28, 1968.

Hays, Algase, Feuer, Porter & Spanier, New York City, for fourth-party plaintiff Cohn, Delaire & Kaufman; Zevie B. Schizer, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for fourth-party defendant Eastman Dillon, Union Securities & Co.;

Thomas W. Kelly, James Pollock, New York City, of counsel.

## OPINION

COOPER, District Judge.

Fourth-party defendant, Eastman Dillon, Union Securities & Co. (hereinafter Eastman), moves, pursuant to § 3 of the United States Arbitration Act, 9 U.S.C., for an order staying the action brought by the fourth-party complainant, Cohn, Delaire & Kaufman (hereinafter Cohn), until arbitration has been had between them, in accordance with the constitution and rules of the American Stock Exchange (AMEX).

### Background

This action was commenced by plaintiff, Barbara Brown, against the unknown seller of 100 shares of Westec Corporation common stock and Gilligan, Will & Co. (hereinafter Gilligan). The complaint alleges that Gilligan, acting as broker on behalf of defendant seller, sold to plaintiff, through the facilities of AMEX, 100 shares of Westec Corporation common stock; that defendant seller was a controlling stockholder of Westec at the time of such sale; that no registration statement was in effect, in violation of § 5 of the Securities Act of 1933 (hereinafter the 1933 Act), 15 U.S.C. § 77e; that the defendants omitted to inform plaintiff that the stock was being sold by a controlling person without such registration statement, in violation of § 12(2) and § 17(a) of the 1933 Act, 15 U.S.C. §§ 77l(2), 77q(a), and § 10(b) of the Securities Exchange Act of 1934 (hereinafter the 1934 Act), 15 U.S.C. § 78j(b); and that at the time Gilligan effected the transaction on AMEX, no registration was effective as to such security for such exchange in violation of § 12(a) of the 1934 Act, 15 U.S.C. § 78l(a). Plaintiff, predicating jurisdiction upon § 22 of the 1933 Act, 15 U.S.C. § 77v, and § 27 of the 1934 Act, 15 U.S.C. § 78aa, demands recission of the sale or, in the alternative, damages.

Defendant Gilligan impleaded Cohn alleging that it acted as Cohn's "clearing agent" in the sale of stock to plaintiff, and consequently, if plaintiff is entitled to any relief, responsibility therefor arises solely by virtue of the acts and omissions of Cohn. The causes of action set forth in the third-party complaint parallel those in the original complaint.

Cohn in turn impleaded Eastman Dillon and Delafield and Delafield (hereinafter Delafield), alleging that it purchased from them 1500 shares of Westec stock for its own account, through the facilities of AMEX; such shares are alleged to have been sold through Gilligan, as clearing broker, to divers purchasers through divers brokers, including Burnham & Co., plaintiff's broker. Cohn seeks judgment over against Eastman Dillon and/or Delafield for any damages or other relief awarded Gilligan against it. The causes of action in the fourth-party complaint parallel those in the original and third-party complaints.

### The Arbitration Act

The United States Arbitration Act applies to a written provision in a "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract." 9 U.S.C. § 2. The Act provides that arbitration agreements within its scope "shall be valid, irrevocable, and enforceable," 9 U.S.C. § 2; and that upon application of a party who is not in default in proceeding with arbitration, the court shall stay the trial of the action until arbitration is had in accordance with the terms of the parties' agreement. 9 U.S.C. § 3. Under this section, the court cannot grant a stay unless it is "satisfied that the issue involved in such suit * * * is referable to arbitration" under "an agreement in writing for such arbitration."

At the outset, we are confronted with Cohn's assertion that it never agreed to arbitrate. Eastman, on the other hand, contends that the constitu-

tion and rules of AMEX, which embody provisions requiring arbitration, constitute a binding contract between the parties. Since the arbitration provision is an integral part of the alleged contract, the issue as to whether the parties agreed to that provision requires us to first determine if a contract exists. See Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., 126 F.2d 978 (2d Cir. 1942).

Cohn and Eastman are broker-dealer firms registered with the Securities and Exchange Commission under the 1934 Act and are member firms of AMEX. AMEX's constitution requires that each individual member ("regular" and "allied") of the Exchange pledge himself in writing to abide by the constitution and all rules adopted pursuant thereto.[1] Accordingly, all general partners of Cohn and Eastman who are admitted to membership on the Exchange have executed this pledge.

 The constitution and rules of a stock exchange constitute a contract between all members of the exchange with each other and with the exchange itself. See Franklin v. Dick, 262 App.Div. 299, 28 N.Y.S.2d 426, aff'd, 287 N.Y. 656, 39 N.E.2d 282 (1941); Cohen v. Thomas, 209 N.Y. 407, 103 N.E. 708 (1913). National League of Commission Merchants of the United States v. Hornung, 148 App.Div. 355, 132 N.Y.S. 871 (1911), aff'd, 153 App.Div. 937, 138 N.Y.S. 1131 (1912), aff'd, 211 N.Y. 575, 105 N.E. 1091 (1914); In re Haebler v. New York Produce Exchange, 149 N.Y. 414, 44 N.E. 87 (1896); Belton v. Hatch, 109 N.Y. 593, 17 N.E. 225 (1888); White v. Brownell, 4 Abb.Pr., N.S., 162 (N.Y.C.P.1868).

Most exchanges require applicants for membership, as a prerequisite to admission, to sign the constitution of the exchange or an agreement to be bound by its provisions. But whether or not express written assent is demanded, every member, by virtue of his admission, contracts to be governed by the conditions of membership which the exchange has imposed. These conditions are, therefore, binding on the members, and constitute virtually a body of law by which the members are governed in their dealings with the exchange and with each other. 1 C. H. Meyer, The Law of Stock Brokers and Stock Exchanges § 7 (1931).[2]

 The provisions of the constitution and rules define the rights of the members as well as their obligations. Exchange members, however, have not only subjected themselves to the organic law of the exchange, as embodied in its constitution and rules, but have bound their firms as well, 1 C. H. Meyer, supra § 19; in turn member firms enjoy the privileges conferred by these rules of the Exchange.[3] See Avery v. Moffatt, 187 Misc. 576, 55 N.Y.S.2d 215 (N.Y. Sup.Ct.1945).

Article VIII, § 1 of the AMEX constitution provides:

Member, member firms, partners of member firms, member corporations and officers and holders of stock in member corporations shall arbitrate all controversies arising in connection with their business between or among themselves. * * *

The Board of Governors of the Exchange, in compliance with the constitution, has prescribed detailed rules regarding arbitration and the conduct of arbitration proceedings.[4]

 Since the rules of the Exchange "constitute ⸱a contract between the members, the arbitration provisions which they embody have contractual

---

1. AMEX Constitution, article IV, § 1(a) (3), 1(b).

2. See 57 New York Jur. Stock and Commodity Exchanges § 4 (1967).

3. The term "rules of the Exchange" includes the constitution and all rules adopted pursuant thereto. AMEX constitution, article I, § 3(a). See also 15 U.S.C. § 78f(a) (3).

4. AMEX Arbitration Rules, rules 600–609.

validity." 1 C. H. Meyer, supra, § 149. See Russell-Coleman Cotton Oil Co. v. C. R. Garner & Co., 242 S.W. 1067 (Tex. Civ.App.1922); National League of Commission Merchants of the United States v. Hornung, supra; Heath v. President of Gold Exchange, 7 Abb.Pr., N.S., 251 (N.Y.C.P.1869). The Exchange provisions requiring arbitration constitute an agreement to arbitrate which is binding upon both Cohn and Eastman. See Osborne & Thurlow v. Hirsch & Co., 10 Misc.2d 225, 172 N.Y.S. 2d 522, 523 (N.Y.Sup.Ct.1958).

■ In addition, the contract involving the stock transaction here in question embodies the arbitration provisions of the Exchange's constitution and rules. Subsections (j) and (k) of § 3 of article I of the AMEX constitution provide that the term "Exchange Contracts" includes all contracts of a member firm with another member firm made on the Exchange for the purchase or sale of securities. Section 1 of Article XI of the constitution provides:

> The provisions of the Constitution of the Exchange and of the rules adopted pursuant thereto shall be a part of the terms and conditions of all Exchange Contracts. * * *

Accordingly, when a transaction of purchase and sale of any security is effected on the Exchange, the contract is subject to all the provisions of the rules of the Exchange including, among others, the arbitration provisions. Cf. Daniel v. Board of Trade of City of Chicago, 164 F.2d 815 (7th Cir. 1947); Crowley v. Commodity Exchange, 141 F.2d 182 (2d Cir. 1944).

*[Applicable state law]*

■ The contract between Cohn and Eastman, when viewed in light of the complaint, appears to evidence "a transaction involving commerce," as required by § 2 of the Arbitration Act, and therefore is within the scope of § 3 of the Act. See Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953); Robinson v. Bache & Co., 227 F.Supp. 456 (S.D.N.Y.1964). Compare Pawgan v. Silverstein, 265 F.Supp. 898 (S.D.N.Y. 1967). The applicability of § 3 to the instant agreement, however, is not solely dependent upon validation of the agreement under § 2. Rather, "in actions arising under a law of the United States * * *, Section 3 of the Arbitration Act authorizes a federal court to stay proceedings pending arbitration not only when the arbitration agreement is validated by Section 2 of the Arbitration Act but also when the agreement to arbitrate is validated by applicable state law." United States for Use and Benefit of Capolino Sons, Inc. v. Electronic & Missile Facilities, Inc., 364 F.2d 705 (2d Cir.), cert. denied, 385 U.S. 924, 87 S.Ct. 239, 17 L.Ed.2d 148 (1966).

■ We are satisfied that New York's arbitration law[5] validates the agreement to arbitrate between Cohn and Eastman. Section 7501 of the New York Civil Practice Law and Rules provides that "[a] written agreement to submit any controversy thereafter arising or any existing controversy to arbitration is enforceable without regard to the justiciable character of the controversy * * *." Additionally, New York courts have granted stays of actions between member firms of a stock exchange where arbitration was sought pursuant to the exchange's constitution. See Osborne & Thurlow v. Hirsch & Co., supra; cf. Ghiron v. Mayr, 19 A.D.2d 54, 241 N.Y.S.2d 144 (1963); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Griesenbeck, 28 A.D.2d 99, 281 N.Y.S.2d 580 (1967) (compelling arbitration). Similarly, an application to stay arbitration between member firms was recently denied.[6]

We conclude that the parties' agreement to arbitrate is valid and enforce-

5. There is no allegation of diversity of citizenship and apparently all relevant contracts and transactions between the parties were executed in New York.

6. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. G. C. Haas & Co., Index No. 11387/67 (Sup.Ct., Special Term, Part I, New York County, July 21, 1967); af-

able under state law, and that the present controversy is within the scope of that agreement.

A somewhat novel question, however, still remains to be answered: Whether the non-waiver provisions of the 1933 and the 1934 Acts, as construed in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182 (1953), and its progeny, render the instant arbitration agreement void when it is sought to be applied to controversies arising under those Acts?

### The Securities Act of 1933

In *Wilko,* a purchaser of securities brought suit under the 1933 Act against partners in a stock brokerage firm to recover damages for alleged misrepresentation in the sale of securities. Prior to answering the complaint, the defendants moved to stay the trial of the action, pursuant to § 3 of the United States Arbitration Act, until arbitration could be had in accordance with the terms of the margin agreements between the parties. The Supreme Court, confronted with the question as to the validity of plaintiff's agreement to submit future controversies to arbitration, held:

The words of § 14 * * * void any 'stipulations' waiving compliance with any 'provision' of the Securities Act. This arrangement to arbitrate is a 'stipulation,' and we think the right to select the judicial forum is the kind of 'provision' that cannot be waived under § 14 of the Securities Act.[7] Id. at 434–435, 74 S.Ct. at 186.

Underlying the court's determination was the knowledge that the 1933 Act was passed for the purpose of protecting investors; it "was drafted with an eye to the disadvantages under which buyers labor." Id. at 435, 74 S.Ct. at 187. When a security buyer waives his right to sue in court, prior to any violation of the 1933 Act, he surrenders "one of the advantages the Act gives him and surrenders it at a time when he is less able to judge the weight of the handicap the Securities Act places upon his adversary." Id. at 435, 74 S.Ct. at 187.[8]

In contrast to *Wilko,* both parties involved in the present motion for a stay are broker-dealer firms belonging to AMEX. The 1933 Act was designed to protect investors by requiring "issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale." Wilko v. Swan, supra, 346 U.S. at

firmed by the Appellate Division, 1st Dept., November 28, 1967, 28 A.D.2d 1209, 285 N.Y.S.2d 266; Motion for leave to appeal to the Court of Appeals denied, April 4, 1968, 21 N.Y.2d 835, 288 N.Y.S.2d 918, 235 N.E.2d 919.

In denying the motion for a stay of arbitration the court stated: "The parties, as members of the American Stock Exchange, concede that they are obligated under the Exchange's constitution to arbitrate 'all controversies arising in connection with their business between or among themselves' (Article VIII, section 1). There is no dispute that petitioner sold 22,700 shares of Westec Corporation Common Stock on the exchange to respondent. Whether respondent has a valid and enforceable claim against petitioner with respect to the controversy arising out of said transaction cannot be considered by this Court on this motion, but must be resolved by the arbitrator (CPLR 7501; Matter of Dairymen's Coop. Assn. [Conrad], 18 A.D.2d 321, 239 N.Y.S.2d 241)."

Merrill Lynch had predicated its motion for a stay on the ground that G. C. Haas & Co. had acted only as a buying broker for customers in effecting the transaction in controversy; therefore, it contended, the controversy was one arising solely between it and Haas' customers. In the instance action, Cohn purchased the securities for its own account.

7. 15 U.S.C. § 77n. § 14 provides: Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.

8. For cases applying *Wilko* to claims arising under the 1933 Act see Pawgan v. Silverstein, 265 F.Supp. 898 (S.D.N.Y. 1967); Maheu v. Reynolds & Co., CCH Fed.Sec.L.Rep. ¶ 92,114 (S.D.N.Y.1967); Fuller v. Dilbert, 32 F.R.D. 60 (S.D.N.Y. 1962); Newkirk v. Jerry McNutt, Hayden, Stone & Co., [1961–1964 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 91,384

431, 74 S.Ct. at 184. Its determined purpose was not to furnish protection to dealers [9] from the improprieties of fellow dealers, although such might be an incidental benefit of the Act's passage. It was assumed that dealers could fend for themselves; it was the investing public that was in need of protection.[10]

### [The non-waiver provision]

Permitting broker-dealers to agree in advance to arbitrate controversies arising between them would not appear to offend the congressional intent underlying passage of the 1933 Act. Parties, however, have not been allowed to waive their statutory rights in advance of the existence of a controversy where either congressional purpose would be thwarted by such waiver or the statute contains a non-waiver provision. See Saucy Susan Products, Inc. v. Allied Oil English, Inc., 200 F.Supp. 724 (S.D.N.Y.1961); Reader v. Hirsch & Co., 197 F.Supp. 111 (S.D.N.Y.1961). Having concluded that enforcement of the instant arbitration agreement would not thwart congressional policy, we turn our attention to the non-waiver provision.[11]

In this section of the opinion, our discussion will focus on the scope of the non-waiver clause (§ 14); in a later section, we discuss the effect of § 28(b) of the 1934 Act on § 14.

The issue presently confronting us is whether broker-dealers are exempted from the non-waiver provision of the 1933 Act, note 6, supra. As set out below, neither the non-waiver provision itself nor any other provision of the 1933 Act permits such an exemption.

The scope of § 14 is quite broad bringing within its coverage "any person acquiring any security." The term "person" similarly has far reaching application.[12] Thus, on its face, the non-waiver provision admits of no such exemption. If exclusion is to be accorded to this particular group, authority for it must be found in some other provision of the 1933 Act or in the application of the non-waiver provision itself.

There is no provision in the 1933 Act which would justify exempting broker-dealers from the ambit of § 14. Additionally, the test for § 14's application is an objective one. Those who may not be in need of its protection have not been excluded from its coverage. The cases applying the *Wilko* doctrine have not read a subjective test, based on a purchaser's need for protection, into § 14. Cf. Pawgan v. Silverstein, supra; Fuller v. Dilbert, 32 F.R.D. 60 (S.D.N.Y.1962). Contrast SEC v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), where the Supreme Court held that the applicability of § 4(1)'s private

---

(Cal.Super.Ct.1963). Compare Whitney v. New York Stock Exchange and Francis I. duPont & Co., CCH Fed.Sec.L.Rep. ¶ 92,106 (S.D.N.Y.1967); Robinson v. Bache & Co., 227 F.Supp. 456 (S.D.N.Y. 1964).

9. The 1933 Act defines "dealer" as "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." 15 U.S.C. § 77b(12).

10. As stated in *Wilko*: "Issuers of and dealers in securities have better opportunities to investigate and appraise the prospective earnings and business plans effecting securities than buyers. It is therefore reasonable for Congress to put buyers of securities covered by that Act

on a different basis from other purchasers." Id. at 435, 74 S.Ct. at 187.
We disagree with movant's reading of "other purchasers" as having reference to "dealers" in securities (fourth-party defendant's memorandum of law, pp. 6–7). Rather, we construe the Supreme Court's language as striking a comparison between purchasers of securities and purchasers of other commodities.

11. The fact that congressional purpose would not be thwarted by a broker-dealer exemption does not *ipso facto* mean that the non-waiver provision permits such an exemption.

12. "Person" is defined as "an individual, a corporation, a partnership, an association, a joint-stock company, a trust, any unincorporated organization, or a government or political subdivision thereof." 15 U.S.C. § 77b(2).

offering exemption, 15 U.S.C. § 77d(1), turns on whether the particular class of persons affected is in need of the Act's protection. There, the 1933 Act nowhere defined the scope of the private offering exemption. Section 14, on the other hand, has set its own scope—"any person [as that term is defined in the Act] acquiring any security [as that term is defined in the Act]." Reading a broker-dealer exemption into § 14 would be a distortion of that provision's unambiguous language.

### The Securities Exchange Act of 1934

■ Section 14 of the 1933 Act has a substantially identical counterpart in § 29(a) of the 1934 Act.[13] Following the rule of *Wilko,* agreements to arbitrate future controversies arising under the 1934 Act have been held void. See Pawgan v. Silverstein, supra; Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965); Maheu v. Reynolds & Co., supra, note 8; Reader v. Hirsch & Co., supra; cf. Colonial Realty Corp. v. Bache & Co., 358 F.2d 178, 183 n. 5 (2d Cir.) cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966); Schine v. Schine, 254 F.Supp. 986 (S.D.N.Y.) appeal dismissed, 367 F.2d 685 (2d Cir. 1966). Compare Robinson v. Bache & Co., supra. The scope of § 29(a) is as all-inclusive as that of § 14; it too admits of no group exemption for broker-dealers as such. The 1934 Act, however, contains other provisions which warrant exempting the instant agreement to arbitrate from the scope of § 29(a).

The 1934 Act set up a statutory scheme of "supervised self-regulation." "This involves control of exchange markets by requiring or permitting national securities exchanges to adopt rules governing their practices and procedures and the business conduct of their members, and in each case imposes the responsibility for enforcement of these rules on the exchanges themselves." SEC, Report of Special Study of Securities Markets, H.R.Doc. No. 95, 88th Cong., 1st Sess., Pt. I, p. 3. See Colonial Realty Corp. v. Bache & Co., supra.

Instead of giving the Commission the power to curb specific instances of abuse, the Act placed in the exchanges a duty to register with the Commission, § 5, 15 U.S.C. § 78e, and decreed that registration could not be granted unless the exchange submitted copies of its rules, § 6(a) (3), 15 U.S.C. § 78f (a) (3), and unless such rules were "just and adequate to insure fair dealing and to protect investors," § 6(d), 15 U.S.C. § 78f(d). Silver v. New York Stock Exchange, 373 U.S. 341, 352, 83 S.Ct. 1246, 1254, 10 L.Ed.2d 389 (1963).

The anticipated highly effective result of this self-regulatory scheme has been the promulgation of rules by exchanges to govern the conduct of exchange members.[14] The Act requires that such rules

13. 15 U.S.C. § 78cc(a). § 29(a) provides: "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."
This provision differs in two respects, here immaterial, from its counterpart in § 14 of the 1933 Act. Reference here is to "any person" as opposed to "any person acquiring any security." The provision in the 1934 Act refers, in addition, to "any rule of an exchange required" by that Act. "Presumably this covers those disciplinary rules which all exchanges are required by § 6(b) to adopt as a condition of registration, as well as any exchange rules altered or supplemented by the Commission pursuant to § 19(b)." 3 L.Loss, Securities Regulation 1812 (2d ed.1961).

14. Certain "rules of the Exchange" are a prerequisite to registration. Section 6(b) of the 1934 Act, 15 U.S.C. § 78f(b), provides: "No registration shall be granted or remain in force unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade, and declare that the willful violation of any provisions of this chapter or any rule or regulation thereunder shall be considered conduct or proceeding inconsistent with just and equitable principles of trade." See note 13, supra.

be "just and adequate to insure fair dealing and to protect investors;" § 6(c), 15 U.S.C. § 78f(c), provides, however, that:

Nothing in this chapter shall be construed to prevent any exchange from adopting and enforcing any rule not inconsistent with this chapter and the rules and regulations thereunder and the applicable laws of the state in which it is located.

In accordance with this policy of self-regulation, the constitution of AMEX mandates that member firms "shall arbitrate all controversies arising in connection with their business between or among themselves * * *," and the Exchange's Board of Governors, pursuant to its constitution, has established rules regarding arbitration and the conduct of arbitration proceedings. Further, the constitution provides that "[f]ailure on the part of a party who has a duty to arbitrate to submit to arbitration * * *, or the institution of a suit in any court by such a party, prior to arbitration * * *, shall constitute an act contrary to just and equitable principles of trade." [15]

### [The non-waiver provision]

These provisions requiring arbitration are in furtherance of Congressional purpose—self-regulation of exchanges—and set forth a desirable procedure for settling disputes between exchange members. If these were the only factors to be considered, we would not hesitate to enforce the agreement of the parties to arbitrate, at least as to those claims arising under the 1934 Act. The non-waiver provision of the 1934 Act, however, poses an additional factor which we have yet to consider.

If § 29(a) stood alone, the parties' agreement to arbitrate future controversies would be void despite the fact that AMEX's constitution requires member firms to arbitrate all controversies arising in connection with their business. But, it does not stand alone; rather, it stands as a part of a legislative Act designed to be administered as a whole. See Fratt v. Robinson, 203 F.2d 627, 630, 37 A.L.R.2d 636 (9th Cir. 1953).

While § 29(a) may not on its face admit of any exemption, the language of § 28(b) of the 1934 Act [16] does exempt "any action taken by the authorities of * * * [an] exchange to settle disputes between its members." [17] The action taken by AMEX in prescribing rules of the Exchange, binding on its members and making arbitration imperative, constitutes "action taken by the authorities of such exchange to settle disputes between its members." [18] Therefore, the instant agreement to arbitrate, which owes its very existence to such rules of the Exchange, must be exempted from the scope of § 29(a) if § 28(b) is to be given effect.

The agreement to arbitrate between Cohn and Eastman differs from the typical arbitration agreement. Here the agreement was thrust upon both parties

---

15. AMEX Constitution, article VIII, § 5 (a). This provision takes on added significance when viewed in connection with the requirements of § 6(b) of the 1934 Act, note 14, supra.

16. 15 U.S.C. § 78bb(b). § 28(b) provides: "Nothing in this chapter shall be construed to modify existing law (1) with regard to the binding effect on any member of any exchange of any action taken by the authorities of such exchange to settle disputes between its members, or (2) with regard to the binding effect of such action on any person who has agreed to be bound thereby, or (3) with regard to the binding effect on any such member of any disciplinary action taken by the authorities of the exchange as a result of violation of any rule of the exchange, insofar as the action taken is not inconsistent with the provisions of this chapter or the rules and regulations thereunder."

17. The term "member" includes "any firm transacting a business as broker or dealer of which a member is a partner." 15 U.S.C. § 78c(a) (3).

18. We do not construe this language as referring only to Exchange action taken after a controversy has arisen. No valid distinction can be drawn between Exchange requirements to arbitrate future and existing controversies.

by the rules of the Exchange. Neither party had the choice of accepting or rejecting it; if they chose to do business on AMEX, they were bound by it. This agreement, resulting as it does from a valid exercise of exchange regulatory power, is entitled to the protection which Congress saw fit to provide in § 28(b).[19]

We conclude that § 28(b) of the 1934 Act exempts the instant arbitration agreement from the invalidating effect of § 29(a). This construction is based not only on the clear language of § 28(b), but also on that provision's place in the overall scheme of self-regulation set up by the 1934 Act.

### The Doctrine of In Pari Materia

One issue remains to be determined: Should § 28(b) of the 1934 Act be applied to the 1933 Act?

The 1933 Act and the 1934 Act "are closely related, were adopted close together in point of time, and were part of the same legislative program." Weber v. C.M.P. Corporation, 242 F.Supp. 321 (S.D.N.Y.1965). The two Acts are unquestionably *in pari materia*—relate to the same subject matter—and should be construed together as if they were one law. See United States v. Stewart, 311 U.S. 60, 61 S.Ct. 102, 85 L.Ed. 40 (1940); United States v. Morgan, 118 F.Supp. 621 (S.D.N.Y.1953) (they are to be "read together as one comprehensive scheme of regulation"); Rosenberg v. Globe Aircraft, 80 F.Supp. 123 (E.D.Pa.1948).

Where two statutes are *in pari materia* and one contains provisions omitted from the other, the omitted provisions have been applied in proceedings under the statute not containing them when not inconsistent with that statute's purpose. See Kleinfelter v. United States, 318 F.2d 929, 162 Ct.Cl. 88 (1963); 2 J. G. Sutherland, Statutory Construction § 5201 (3rd ed. Horack 1943); 82 C.J.S. Statutes § 366 (1953).

We are satisfied that, under the present facts, the application of § 28(b) to the 1933 Act is in accord with legislative intent. This construction is both reasonable and logical in light of the aims and designs of the total body of law affecting this precise subject matter.

It is understandable that no comparable provision appears in the 1933 Act since that Act did not concern itself with the regulation of stock exchanges. We see no valid reason for holding that controversies arising between exchange members under the 1934 Act are arbitrable in accordance with the rules of the Exchange, while those controversies arising under the 1933 Act are not; nor do we believe Congress intended such a result. Rather, application of § 28(b) to the 1933 Act is consistent with the legislature's express desire not to modify existing law with regard to the binding effect of any action taken by exchanges to settle member disputes.

Applying § 28(b) to the 1933 Act, we hold that the instant agreement to arbitrate is exempt from the coverage of § 14.

---

19. A reliable commentator, foreseeing the issue presently confronting us, stated the following with regard to the applicability of § 28(b): "Moreover, the result [reached in Wilko] might well be different in the case of an action based (expressly or by implication) on the 1934 Act—at least when the disputants are exchange members—in view of the provision in § 28(b) of that Act to the effect that nothing in the statute "shall be construed to modify existing law (1) with regard to the binding effect on any member of any exchange of any action taken by the authorities of such exchange to settle disputes between members, or (2) with regard to the binding effect of such action on any person who has agreed to be bound thereby." 3 L. Loss Securities Regulation 1814 n. 430.

Two observations need be made: First, as previously indicated, *Wilko* has been applied to controversies arising under the 1934 Act; second, clause (2) of § 28(b) would not save a customer's agreement to arbitrate future controversies arising under the 1934 Act from the non-waiver provision. Compare Moran v. Paine, Webber, Jackson & Curtis, [1966–1967 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 91,843 (W.D.Pa.1966).

*Conclusion*

We find the statutory claims here involved not inappropriate for enforcement by arbitration. Cf. Moran v. Paine, Webber, Jackson & Curtis, 389 F.2d 242 (3rd Cir. 1968); Moran v. Paine, Webber, Jackson & Curtis, 422 Pa. 66, 220 A.2d 624 (1966). Compare American Safety Equipment Corp. v. J. P. Maguire & Co., Inc., 391 F.2d 821 (2d Cir. 1968) (antitrust claims).

Eastman's motion for an order staying the action brought by Cohn until arbitration has been had between the parties is granted.

It is to be noted, however, that the fourth-party action is one for indemnification. Accordingly, arbitration should not proceed at the present time, but should await the outcome of plaintiff Brown's suit against Gilligan and Gilligan's claim over against Cohn. The order to be entered herein should include the provision that the causes of action set forth in the fourth-party complaint are subject to arbitration, and that such arbitration is stayed pending determination of the other claims.

Settle order on notice.