**JOHN OLAGUES TRADING CO., a California corporation and M. Blair Hull, an individual, Plaintiffs,**

v.

**FIRST OPTIONS OF CHICAGO, INC., Defendant.**

No. 84 C 5009.

United States District Court, N.D. Illinois, E.D.

June 22, 1984.

---

Joseph H. Spiegel, Janel S. Fain, Spiegel & Fain, Ltd., Chicago, Ill., for plaintiffs.

Joseph A. Sutherland, Stephen P. Bedell, Charles R. Manzoni, Jr., Gardner, Carton & Douglas, Chicago, Ill., for defendant.

## MEMORANDUM ORDER

BUA, District Judge.

Before the Court is defendant's motion to dismiss the complaint for injunctive relief and defendant's emergency motion requesting a stay pending arbitration.[1] Plaintiffs' allege violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (hereinafter "the Exchange Act"), and Rules 10b–4 and 10b–5 thereunder, 17 C.F.R. § 240.10b–4, 10b–5. Defendant argues that this Court lacks jurisdiction because the complaint fails to state a federal private cause of action.

For the reasons stated herein, the Court grants defendant's motion to dismiss Counts I and III and grants defendant's motion to stay Counts II and IV.

## I. FACTS

The following facts are alleged in plaintiffs' amended complaint for injunctive relief. For purposes of this order they are considered to be true.

### A. Rule 10b–4 Allegations

On or about May 14, 1984, Teledyne, Inc., (hereinafter "Teledyne") offered to purchase back five million shares of its stock for $200 per share. The proration date was set as May 25, 1984, at 3:00 p.m., Los Angeles time[2] and the expiration date was set as June 4, 1984, at 3:00 p.m.

Plaintiffs John Olagues Trading Company (hereinafter "OTC") and M. Blair Hull (hereinafter "Hull") are registered securities brokers/dealers under § 15 of the Exchange Act and are "market-maker members" of the Chicago Board Options Exchange (hereinafter "the Exchange"). Defendant First Options of Chicago, Inc. (hereinafter "First Options") is a broker/dealer, a "clearing member" of the Exchange and at all relevant times "cleared" the accounts of plaintiffs.

On or about May 22, 1984, First Options agreed to assist Hull in avoiding risk or problems with respect to the Teledyne tender offer. On May 25, 1984, between 11:00 a.m. and 1:30 p.m., following a personal review of his account at First Options with respect to his position in Teledyne, Hull requested preparation of a tender notice for approximately 15,000 shares. Hull's review erroneously considered 44 short call options as not being assigned. At 11:45 a.m., Hull's employee was informed by First Options that it had prepared an "exercise notice" for certain of Hull's "long call options contracts" in Teledyne. Hull, based in part on information supplied by First Options, amended the tender notice to First Options to read 24,800 Teledyne shares which became a contract to sell or otherwise dispose of securities.

At 3:02 p.m., two minutes after Teledyne's proration date, a Hull employee telephoned First Options to amend the "notice"

---

1. Plaintiffs' original complaint predicated federal jurisdiction on alleged violations of Rule 10b–4. After defendant moved to dismiss the original complaint for lack of federal jurisdiction, plaintiffs amended their complaint to add violations of Rule 10b–5. (See Counts II and IV of amended complaint.) Since neither party has addressed the Rule 10b–5 counts in their briefs, the Court will consider defendant's motion to dismiss as directed solely at the Rule 10b–4 counts (Counts I and III). Defendant's motion for a stay, however, will be considered directed at all counts in the amended complaint.

2. Unless otherwise noted, all times are given in Los Angeles time.

to reflect Hull's error to the extent that Hull was short 4,400 shares of Teledyne (the 44 short call contracts). Due to this error the tender notice should have only been for 20,400, assuming no "assignments." A First Options' employee, however, stated that the "window" had closed two minutes earlier and thus nothing could be done. The employee further stated that it was much better to tender all of Hull's Teledyne shares and be short the number of shares tendered on May 25, 1984, than for Hull not to tender all of his shares of Teledyne. The First Options' employee urged Hull's employee not to worry.

Hull notified First Options again on May 25 of the erroneous tender based not only on the 4,400 share computer error, but also on First Options' failure to notify Hull of the assignment of certain "call options contracts" in Teledyne. After the "call options contracts" were considered, Hull was at least 19,200 shares short.

On May 25, 1984, plaintiff OTC entered into an oral contract with First Options whereby First Options was to tender, on OTC's behalf, 23,800 Teledyne shares to Teledyne pursuant to Teledyne's tender offer. On or before May 29, 1984, First Options informed Hull that it had notified Teledyne that 24,800 of Teledyne shares for Hull would be delivered pursuant to the tender offer.

Between May 29, 1984 and June 8, 1984, OTC orally informed First Options that the contract was based on a unilateral mistake of fact in that OTC owned, and thus could deliver, only 14,600 "net long" Teledyne shares and not the 23,800 as originally stated. OTC informed First Options that the May 25 contract was illegal in that the contract violated Rule 10b–4 and that therefore no contract existed.

Both Hull and OTC told First Options not to tender any Teledyne shares they did not hold, own or control. First Options, however, continued to state that there was no problem with a "short tender" and that plaintiffs should tender all of their Teledyne shares and thus be "net short" as opposed to failing to tender at least all of the Teledyne shares they owned by rescinding the tender. Plaintiffs relied upon assurances of First Options' employees that the short tender would never be a problem and that they would not be called upon to deliver the extra shares.

On June 12, 1984, Teledyne informed First Options that First Options must deliver 93,000 additional shares of Teledyne, the total amount which First Options had not tendered as of that morning. On June 13, 1984, Hull and OTC were notified by First Options that it intended to buy 19,200 Teledyne shares and 9,200 Teledyne shares respectively for their two accounts after the close of business at an undisclosed price to satisfy First Options' obligation to Teledyne.

Plaintiffs individually notified First Options on June 13, 1984, not to tender any shares they did not currently own or control for the following reasons:

1) That the contracts between plaintiffs and First Options were void and nonenforceable in that they were illegal contracts and, further, were based upon a mistake of fact;

2) That First Options violated Rule 10b–4 in that it had been involved in a short tender in violation of SEC Rules and Regulations;

3) That plaintiffs orally demanded that First Options not take any action which would appear to affirm or ratify plaintiffs' original tender of May 25, 1984;

4) That on May 25, 1984, plaintiffs did not "own" a sufficient number of Teledyne shares to meet the May 25, 1984 tender offer, First Options knew plaintiffs did not own the shares, and plaintiffs did not give First Options any information that would permit them to reasonably believe that plaintiffs would be able to deliver the shares tendered on May 25, 1984.

## B. Rule 10b–5 Allegations

Plaintiffs' allegations of Rule 10b–5 violations in Counts II and IV reallege and incorporate the facts under the Rule 10b–4 sections. In addition, plaintiffs allege that their contracts with First Options are void

because First Options violated Rule 10b–5 by directly being a party to a scheme, device, and artifice to defraud by virtue of its actions, statements and omissions.

On or about May 25, 1984, First Options told Teledyne that Hull would tender 24,800 shares knowing that Hull was at least 4,400 shares short and could possibly be as much as 19,200 shares short due to the number of Hull's short Teledyne call options contracts which would be assigned. First Options made the offer to Teledyne knowing that the window was closed and that Hull was thus precluded from correcting errors in his tender.

On or about May 25, 1984, and May 29, 1984, First Options made false statements of facts to plaintiffs. These included statements that it was better to be short the tender than not to tender all the shares which plaintiffs' owned and that plaintiffs would not be called upon to tender more shares than they actually owned. Moreover, First Options failed to inform plaintiffs when they made their respective offers to tender that:

1) Teledyne could demand all shares tendered;

2) First Options was also an agent for Teledyne;

3) Many of First Options' "market makers" held Teledyne positions which could cause a "squeeze" in the market and make it difficult for plaintiffs to borrow the Teledyne stock necessary to satisfy their tenders;

4) SEC Rule 10b–4 had been recently amended and that the amendment might effect plaintiffs' transactions.

Plaintiffs seek injunctive relief concerning First Options' alleged violations of Rules 10b–4 and 10b–5.

## II. DISCUSSION

### A. Motion to Dismiss

Rule 10b–4 was adopted by the Securities Exchange Commission in 1968 [3] for the purpose of prohibiting "short tendering." It was thus designed to prohibit the practice

of "tendering more shares than a person owned in order to avoid or reduce the risk of *pro rata* acceptance in tender offers for less than all of the outstanding securities of a class or series." Securities Exchange Act Release No. 20799 (March 29, 1984). When an offer to purchase is made by someone like Teledyne, and more shares are offered by owners like plaintiffs than are desired by Teledyne, Teledyne accepts only a percentage of the stocks tendered by each stockholder. Therefore, some tendering shareholders have traditionally "short tendered," that is they tender more shares than they actually own in order to have more of their shares accepted after proration. Rule 10b–4 protects those tendering shareholders, who tender only the amount of shares which they actually own, from the dilution of their pro rata acceptance by virtue of "short tendering" by other shareholders.

In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court set forth four requirements for the implication of a private right of action under a statute like Rule 10b–4 which does not explicitly grant such a right: (1) plaintiffs must be "one of the class for whose *especial* benefit the statute was enacted," (emphasis in original); (2) there must be a legislative intent to create such a remedy; (3) implying the private remedy must be "consistent with the underlying purpose of the legislative scheme," and (4) the private remedy must not be one that is traditionally relegated to state law. *Id.* at 78, 95 S.Ct. at 2088. Ultimately, the question is one of legislative intent. *Mid-America National Bank v. First Savings and Loan*, 737 F.2d 638, 639–40 (7th Cir.1984).

Clearly, Rule 10b–4 was enacted to protect shareholders who tender only the amount of shares which they actually own from dilution of their *pro rata* acceptance caused by "short tendering" of other shareholders. Here, neither plaintiff is able to allege that his offer was diluted by such a practice. Therefore, plaintiffs are not

**3.** Securities Exchange Act Release No. 8321 (May 28, 1968), 33 Fed.Reg. 8269 (1968).

members of the class meant to be protected by Rule 10b–4 and therefore fail to state a private cause of action under Rule 10b–4. Accordingly, Counts I and III are dismissed.

## B. Motion to Stay

In Counts II and IV of the amended complaint, plaintiffs charge First Options with violating Rule 10b–5 and seek injunctive relief. First Options argues that Counts II and IV should be stayed pending arbitration.[4]

All the parties to this action are members of the Chicago Board Options Exchange. In addition, OTC and Hull are parties to separate but identical "Market-Maker's Agreements" with First Options.

Both the Exchange Rules and the Market-Maker's Agreement provide for arbitration of disputes. Chicago Board Options Exchange Rule 18.1(a) provides:

> Any dispute, claim or controversy arising between parties who are members or persons associated with a member which arises out of the exchange business of such parties shall, at the request of any such party and the approval of the exchange's director of arbitration, be submitted for arbitration in accordance with these rules.

In addition, the Market-Maker's Agreement provides:

> It is agreed that any controversy between us arising out of the undersigned's business or this agreement ... shall be submitted to and determined by arbitration conducted under the provisions of the constitution and rules of the Chicago Board Options Exchange, Inc. or other national securities exchange or pursuant to the Code of Arbitration of the National Association of Securities Dealers, as the undersigned may elect.

The United States Arbitration Act, 9 U.S.C. § 1 *et seq.*, (hereinafter "the Arbitration Act"), recognizes a strong federal policy favoring arbitration as an alternative dispute resolution process and as the up-

holding of private contractual obligations. *Moses H. Cone Memorial Hospital v. Mercury Construction*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The Arbitration Act applies to a written provision in a "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract." 9 U.S.C. § 2. The Arbitration Act provides that arbitration agreements, within its scope, "shall be valid, irrevocable, and enforceable." *Id.* The Arbitration Act further provides that, upon application of a party who is not in default in proceeding with arbitration, the court shall stay the trial of the action until arbitration is had in accordance with the terms of the parties' agreement. *Id.* at § 3. Recently, the Supreme Court, in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), commented:

> The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability.

*Id.* 103 S.Ct. at 941–42.

In *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the Supreme Court held that, in a suit by a customer against a brokerage firm, the "non-waiver" provision of Section 14 of the 1933 Act rendered the arbitration clause void. In interpreting *Wilko*, however, the Fifth Circuit has stated that, in light of 15 U.S.C. § 78bb(b), there is no reason to extend the nonwaiver provision beyond cases involving ordinary investors, to disputes between stock exchange members. *Tullis v. Kohlmeyer & Co.*, 551 F.2d 630, 638 (5th Cir. 1977).

In *Brown v. Gilligan, Will & Co.*, 287 F.Supp. 766 (S.D.N.Y.1968), the court considered an action under both the 1934 and 1933 Acts between members of the Ameri-

---

4. See *supra,* n. 1.

can Stock Exchange. The court found the *Wilko* decision inapplicable to a suit between members of an exchange, reasoning that if Section 78cc(a) stood alone, the parties' agreement to arbitrate would be void. The court concluded that, to the contrary, if effect is to be given to Section 78bb(b), an arbitration agreement between exchange members must be enforced. *Id.* at 774–75. Based on that reasoning, the court enforced the arbitration clause at issue. The Second and Fifth Circuits have supported the *Brown* doctrine as to the effect of nonwaiver provisions on arbitration clauses, as applied to exchange members. *See Tullis v. Kohlmeyer & Co.,* 551 F.2d 632 (5th Cir.1977); *Alexrod & Co. v. Kardich, Victor & Neufeld,* 451 F.2d 838 (2nd Cir.1971). *See also Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1211–12 (2nd Cir.1972); *Bear v. Hayden Stone, Inc.,* 526 F.2d 734, 736 (9th Cir.1975); *Himebaugh v. Smith,* 476 F.Supp. 502, 506–07 (C.D.Cal.1978).

Arbitration in this case is appropriate because the parties have agreed to be bound by the rules of the Exchange and have entered into a contract providing for arbitration. It is consistent with Congressional intent to preserve the Exchange's self-regulatory powers by enforcing arbitration provisions and removing its members' disputes from the courts. *See Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1212 (2d Cir.1972). Here, enforcement of the arbitration provisions would not only reflect the parties' contractual intent and obligations, but would further the policies that Congress sought by enacting the Arbitration Act and 15 U.S.C. § 78bb(b). Plaintiffs' argument that arbitration is inappropriate due to plaintiffs' prayer for injunctive relief is without merit. Although the Court granted plaintiffs' motion for a temporary restraining order, upon reflection, it is readily apparent that plaintiffs' alleged injuries may be redressed adequately with damages relief. An arbitrator can give such relief. Accordingly, Counts II and IV are stayed pending arbitration between the parties.

CONCLUSION

Counts I and III are dismissed for failure to allege a federal cause of action under Rule 10b–4. Counts II and IV, alleging violations of Rule 10b–5, are dismissed without prejudice pending arbitration. The Court does not express any opinion on the merits of issues which may be presented to the arbitrator.

IT IS SO ORDERED.