Percy D. AYRES, Appellant,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.

No. 75-2007.

United States Court of Appeals, Third Circuit.

Argued March 11, 1976.

Decided June 28, 1976.

**28.** The judgments are reversed in the cases bearing docket numbers 74-2281, 75-6014— 75-6018, 75-6020—75-6027, 75-6031—75-6032.

David L. Grove, Philadelphia, Pa., for appellant; Frank S. Deming, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., of counsel.

C. Clark Hodgson, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa. and Roger J. Hawke, Brown, Wood, Ivey, Mitchell & Petty, New York City, for appellee.

Harvey L. Pitt, Gen. Counsel, Paul Gonson, Associate Gen. Counsel, Frederic T. Spindel, Asst. Gen. Counsel, Martin S. Berglas, Atty., S. E. C., Washington, D. C., amicus curiae.

Before VAN DUSEN and WEIS, Circuit Judges, and STERN, District Judge.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is an appeal from a district court judgment entered July 7, 1975, confirming a decision rendered by arbitrators of the New York Stock Exchange ("NYSE"). The principal question involves the applicability and validity of an Exchange arbitration rule in the context of a dispute arising under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.[1] For the reasons set forth below, we vacate the judgment of the district court and remand for further proceedings.

During a period from 1945–1970, plaintiff-appellant, Percy D. Ayres, was employed as a registered representative or "account executive" with the firm of Merrill Lynch, Pierce, Fenner & Smith, Inc., a well-known broker-dealer. Through various stock purchases and stock dividends, Ayres became the owner of 8,000 shares of Merrill Lynch common stock. In connection with his original and subsequent purchases, Ayres entered into agreements with Merrill Lynch which, inter alia, gave Merrill Lynch an option, exercisable for any reason on 90 days' notice, to repurchase all or any part of such stock held by Ayres. Merrill Lynch stock was not publicly owned during the period, and Ayres was permitted to own the stock solely because of his status as an employee.

The complaint alleged that, in the spring of 1970, Merrill Lynch began actively to explore the possibility of making a public offering of its stock. By July, the corporation's management had made an initial decision to go public and was taking prelimi-

---

1. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5 (1975). Jurisdiction is based on § 27 of the Act, 15 U.S.C. § 78aa, and on 28 U.S.C. § 1332. The amount in controversy, exclusive of interest and costs, exceeds $10,000.

nary steps towards accomplishing that goal. During the late summer, Ayres, who was ignorant of the planned offering which had not been publicly announced and who was under the impression that he would be permitted to retain his 8,000 shares of stock, advised Merrill Lynch of his intention to retire on October 1, 1970.[2]

Advised by a fellow employee of the possibility that Merrill Lynch would exercise its 90-day options upon his retirement, Ayres approached a Merrill Lynch vice president to inquire about the firm's plans. The vice president told Ayres that he would take up the matter with the corporation's executives in New York and subsequently reported that Ayres would, in fact, be required to sell his stock if he chose to retire. Neither the vice president with whom Ayres spoke nor any other representative of Merrill Lynch informed Ayres of the prospective public offering. Unaware of the firm's plans, Ayres decided, on the basis of available information, to retire and thus to sell his 8,000 shares. Merrill Lynch subsequently purchased Ayres' stock for $209,064.

Asserting that Merrill Lynch had "wrongfully concealed" material non-public information in connection with the purchase and sale of securities, in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5, Ayres commenced this action on December 13, 1971, seeking rescission of the sale and/or damages. The theory of Ayres' complaint, which alleged violation of the anti-fraud provisions of the Securities Exchange Act and of state law, was that (1) in the absence of his voluntary retirement, Merrill Lynch would not have exercised its repurchase option, and (2) if he had known of the information Merrill Lynch "concealed," he would have chosen not to trigger the sale by postponing his retirement.[3]

Defendant Merrill Lynch responded to the complaint by moving, pursuant to § 3 of the United States Arbitration Act, 9 U.S.C. § 3,[4] for a stay of proceedings pending arbitration. Specifically, Merrill Lynch, a member firm of the NYSE, asserted that the dispute was "[a]ny controversy . . . arising out of [Ayres'] employment or termination of employment" and was, therefore, subject to compulsory arbitration under Stock Exchange Rule 347(b) by which both Ayres and Merrill Lynch had agreed to be bound when Ayres became a registered representative in 1945.[5] In answer to the argument that agreements to arbitrate future federal securities controversies are "void" under the anti-waiver provision of the Securities Exchange Act, 15 U.S.C. § 78cc(a) and *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), Merrill Lynch contended that Exchange Rule 347(b) fell within the compass of § 28(b), which exempts, *inter alia,* certain stock exchange "action" from the invalidating effect of the anti-waiver provision. See 15 U.S.C. § 78bb(b).

The district court agreed with Merrill Lynch's contentions that Exchange Rule 347(b) was applicable on its face and was exempt from the anti-waiver provision of the Act. Accordingly, by opinion and order dated January 19, 1973, the court stayed all

---

**2.** Although Ayres had turned 65 in 1967, he had decided at that time to take advantage of Merrill Lynch's retirement policy under which he could remain in the firm's employ on a year-to-year basis until he attained the age of 70. Ayres retired at the age of 67, two days before his 68th birthday.

**3.** Cf. *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 412 F.Supp. 45 (E.D.Mo., Findings, Conclusions and Judgment of March 24, 1976), at pp. 5, 20, 22, 26, 30, & 31 of typed Findings and Conclusions. At page 49 of the opinion, the court found that Merrill Lynch "had no uniform policy in exer-

cising the options to purchase stock at retirement . . . of a stockholder."

**4.** Ayres has never contended that the arbitration agreement does not fall within the ambit of 9 U.S.C. §§ 1, 2. See *Dickstein v. duPont,* 443 F.2d 783, 784–85 (1st Cir. 1971). See also *Gavlik Constr. Co. v. H. F. Campbell Co.,* 526 F.2d 777, 784–85 (3d Cir. 1975).

**5.** At the time Ayres became a registered representative, he filed with the Exchange an application for approval of his employment with Merrill Lynch. As part of that application he agreed to be bound by existing Exchange rules

proceedings pending arbitration.[6] The arbitrators, without stating reasons, subsequently rendered a decision adverse to Ayres on all claims, and the district court confirmed this decision in a final judgment entered July 7, 1975. This timely appeal followed.

In our view, the primary question presented by this appeal concerns the district court's conclusion that the arbitration agreement embodied in Exchange Rule 347(b) governs this controversy. That Rule provides:

"Any controversy between a registered representative and any . . . member organization arising out of the employment or termination of employment of such registered representative by and with such . . . member organization shall be settled by arbitration, at the instance of any such party, in accordance with the arbitration procedure described elsewhere in these rules."

Acknowledging that the present controversy "does not clearly and squarely relate to the business functions and commercial transactions normally engaged in by a registered representative of the Exchange in the performance of his prescribed duties,"[7] the district court nevertheless concluded that the dispute in this case was "any controversy . . . arising out of [Ayres'] employment or termination of employment" with Merrill Lynch and hence fell within the purview of Exchange Rule 347(b). The exclusive basis for this determination was the fact that Ayres was initially permitted

to purchase Merrill Lynch stock solely because of his status as an employee. *Ayres v. Merrill Lynch, Pierce, Fenner & Smith, supra,* 353 F.Supp. at 1087, 1091.

Although we find the question not free from doubt, we do not think that Exchange Rule 347(b) was intended to cover a controversy that has a causal connection to the fact of employment as remote as that involved in this dispute. All of the cases that have applied Exchange Rule 347(b) concerned the terms of the consensual relationship between registered representatives and Exchange members and the respective rights and duties of the parties as employer and employee.[8] While we have no occasion to mark the bounds of Exchange Rule 347(b), we believe the Rule was primarily designed to cover such disputes and that the present controversy falls outside the perimeter of the rule.

In our view, the dispute here has its primary genesis in an alleged securities fraud and concerns Ayres' rights under federal and state securities laws as a stockholder and as a seller of securities. It does not center on Ayres' rights as a former employee under any consensual arrangement relating to the terms and conditions of his employment or termination. Although, in a purely factual sense, the claims are connected with the termination of employment, the legal rights being asserted have a source wholly independent of the employment relationship. Arbitration is a matter of contract, and we do not think Ayres can rea-

---

and all amendments thereto. Exchange Rule 347(b) was adopted in 1958.

**6.** The district court opinion is reported at 353 F.Supp. 1084 (E.D.Pa.1973). A timely appeal from the January 19 order was dismissed for lack of the requisite finality. See Order filed May 1, 1973 (Document No. 16, E.D.Pa., Civil No. 71–2986) and April 27, 1973, order of this court at No. 73–1231. As noted above, the complaint seeks rescission and/or money damages. See *Stateside Machinery Co. v. Alperin,* 526 F.2d 480, 484–85 (3d Cir. 1975), and cases cited therein.

**7.** *Ayres v. Merrill Lynch, Pierce, Fenner & Smith,* 353 F.Supp. 1084, 1087 (E.D.Pa.1973). The district court also stated that, except for

the fact that Ayres was permitted to purchase the stock "*solely*" because of his status as an employee, "the controversy would otherwise not touch upon or concern the performance of the plaintiff's duties as a registered representative *qua* registered representative and the plaintiff's position would be analogous to that of a public investor." *Id.* at 1091.

**8.** See, *e. g., Stokes v. Merrill Lynch, Pierce, Fenner & Smith,* 523 F.2d 433 (6th Cir. 1975); *Dickstein v. duPont,* 443 F.2d 783 (1st Cir. 1971); *Isaacson v. Hayden, Stone, Inc.,* 319 F.Supp. 929 (S.D.N.Y.1970); *Moritz v. Francis I. duPont & Co.,* 291 Minn. 523, 189 N.W.2d 487 (1971).

sonably be understood to have waived his right to judicial trial of such claims.

■ The Supreme Court has characterized Exchange Rule 347(b) as relating to the "exchange's housekeeping affairs" and has suggested it deals primarily with "the area of wage claims." *Merrill Lynch, Pierce, Fenner & Smith v. Ware,* 414 U.S. 117, 136, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973). To conclude that the Rule applied under the unusual circumstances of this case would be, in our view, to stretch the Rule well beyond those goals. Here the arbitrators would be called upon to apply legal precepts whose importance transcends the Exchange's interests in self-governance and to draw upon far more than the specialized knowledge of industry needs and practices that makes arbitration appropriate when the terms and conditions of the employment relationship are at issue. *Cf. Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 56–57, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Moreover, the Securities and Exchange Commission, which now has jurisdiction to amend, modify or repeal any Exchange rule, opposes any construction which would make Exchange Rule 347(b) applicable under the circumstances of this case. See 15 U.S.C. § 78s(b). *Compare Merrill Lynch, Pierce, Fenner & Smith v. Ware, supra,* 414 U.S. at 129–131, 94 S.Ct. 383. See page 538 below.

■ Our conclusion that Exchange Rule 347(b) is inapplicable here is buttressed by the fact that even if Exchange Rule 347(b) was intended to govern controversies such as this, we believe it would, in any event, be unenforceable and invalid as applied to this case.[9] In *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the Supreme Court held that the anti-waiver provision of the Securities Act of 1933, 15 U.S.C. § 77n, which is almost identical to § 29(a) of the 1934 Act, 15 U.S.C. § 78cc(a),[10] rendered "void" a prospective agreement between a brokerage firm and a customer which would have required arbitration of the customer's claim under § 12(2) of the 1933 Act. We need not review here the fundamental and important differences between litigation in a court and arbitration.[11] It is enough to say that the Supreme Court found prospective waivers of the right to judicial trial and review to be inconsistent with Congress' overriding concern for the protection of investors. *Wilko v. Swan, supra,* 346 U.S. at 437, 74 S.Ct. 182; see *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 512, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). As Merrill Lynch points out, a "colorable argument can be made" that *Wilko v. Swan* should not apply to arbitration of judicially implied causes of action under the 1934 Act. We are not, however, persuaded that either the differences between the rights granted in the 1933 and 1934 Acts or any consideration of policy warrant such a distinction.[12] And

**9.** The existence of countervailing federal policies, see *Wilko v. Swan, supra,* makes cases showing an hospitable attitude to the construction of arbitration clauses inapposite. For example, *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), on which Merrill Lynch principally relies, expressly terms "the run of arbitration cases, illustrated by *Wilko v. Swan* . . . irrelevant." *Id.* at 578, 80 S.Ct. at 1351.

**10.** Section 14 of the 1933 Act, 15 U.S.C. § 77n, provides:

"Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."

Section 29(a) of the 1934 Act, 15 U.S.C. § 78cc(a), provides:

"Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."

**11.** See, *e. g. Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 56–58, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Wilko v. Swan, supra,* 346 U.S. at 435–37, 74 S.Ct. 182; *Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 203 & n. 4, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

**12.** This "colorable argument" was mentioned, but not explored, in dicta in *Scherk v. Alberto-Culver Co., supra,* 417 U.S. at 513–14, 94 S.Ct. 2449, a 5–4 decision in which the Court accepted the premise that *Wilko v. Swan* was applicable. The Court noted that the 10b–5 cause of action is judicially implied, whereas § 12(2) expressly provides a private cause of action, and that the 1934 Act vests exclusive jurisdic-

we note that Congress appears to have accepted the view that *Wilko v. Swan* applies in the 10b–5 context. *Cf.* H.R.Rep.No.94–229, 94th Cong., 1st Sess., at 111 (1975), U.S.Code Cong. & Admin.News 1975, p. 321.

■ Merrill Lynch contends that the anti-waiver provision of the Securities Exchange Act and the policy considerations articulated in *Wilko* are inapplicable here because Ayres' complaint fails to state a claim for relief under the Act. Relying on *Ryan v. J. Walter Thompson Co.*, 453 F.2d 444 (2d Cir. 1971) (per curiam), *cert. denied*, 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972), Merrill Lynch argues that the facts it failed to disclose concerning the planned public offering were not "material" from Ayres' standpoint because "regardless of what he knew or did not know," Ayres was, in any event, contractually obligated under the 90–day option agreement to sell his Merrill Lynch stock. See *Ryan v. J. Walter Thompson, supra*, 453 F.2d at 447. We disagree.

In *Ryan*, the plaintiff brought a 10b–5 action against his former employer which had exercised its contractual option to purchase his stock but had not informed him of its plans to go public. Because Ryan's sale was totally involuntary from his own point of view, the court concluded that the undisclosed facts were not material.[13] In the present case, this critical element of lack of choice on the plaintiff's part is lacking. According to the complaint, Ayres' voluntary decision to retire was also a voluntary decision to sell. The complaint alleges that Ayres could and would have elected not to retire and not to sell his stock had he known of Merrill Lynch's plans.[14] More significantly, before discussing the merits of the 10b–5 claim, the *Ryan* court noted its agreement with the district court's holding on summary judgment, that the repurchase option in that case was valid under New York law. Here, in contrast, the district court has made no such determination. Without intending to finally determine an issue on which the trial judge has yet to express a view, we note that arguments can be made that Merrill Lynch's option agreement, as exercised in this case, was invalid under either federal or state law and that the information Merrill Lynch failed to disclose was therefore material. See *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra* note 3, at 20–28.[15] Under these circumstances, we be-

tion in the federal courts while the 1933 Act grants concurrent federal and state jurisdiction.

**13.** As Jennings and Marsh, citing *Ryan v. J. Walter Thompson, supra*, explain:

"If the other party to the transaction has no choice in the matter, then no information is 'material' to him."

R. Jennings & H. Marsh, Securities Regulation, 1128 n. 33 (3d ed. 1972). See also *Fershtman v. Schectman*, 450 F.2d 1357, 1360 (2d Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).

**14.** The complaint (paragraphs 24, 33 and 34) alleges that "[h]ad plaintiff not retired on October 1, 1970, plaintiff would not then have been required to sell to defendant his stock of defendant, nor could he thereafter have been required to sell to defendant his stock of defendant if he remained in defendant's employ until . . . ." June 23, 1971, when defendant removed from its common stock all restrictions and options effective one year after termination of the public offering of June 23, 1971. In *Ryan* (322 F.Supp. at 308), the allegation was that if the plaintiffs had known of Thompson's contemplated public offering approximately two years after his retirement, when the option was exercised, "they would not have made the sale" (not that Ryan would not have retired), which they were bound by contract to make. Furthermore, Ryan "indicated a knowledge of the possibility that Thompson would change its policy and have public stockholders," making its stock more valuable at the time he made the sale under the option, and wrote that the price he received as "gratifying" (322 F.Supp. at 310). Also, the district court found that when the option was exercised in January 1969 by Thompson, "Thompson was 100% employee owned and might so remain indefinitely" (322 F.Supp. at 314). The district court found that it was a "necessary" business policy for Thompson to exercise the options of employees retiring in 1966 and before if it were to go public (322 F.Supp. at 312).

**15.** In *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith,* the district court stated at page 56 that:

"The nondisclosure was part of a scheme to maintain management control and to increase the per share earnings of Merrill Lynch stock prior to a public offering at the expense of plaintiffs and other non-employee

lieve the policies underlying *Wilko v. Swan* are fully applicable.

Merrill Lynch also argues that § 28(b) of the Securities Exchange Act exempts Exchange Rule 347(b) from the invalidating effect of the anti-waiver provision of the Act. As amended,[16] § 28(b) provides:

> "Nothing in this title shall be construed to modify existing law with regard to the binding effect (1) on any member of or participant in any self-regulatory organization of any action taken by the authorities of such organization to settle disputes between its members or participants, . . . or (3) of any action described in paragraph (1) . . . on any person who has agreed to be bound thereby."

Merrill Lynch argues that § 28(b)(3) operates to preserve the "binding effect" on Ayres of Exchange Rule 347(b). In their view, promulgation of Exchange Rule 347(b) constituted the type of "action" contemplated by the statute and Ayres is a "person who has agreed to be bound thereby."

We agree with Merrill Lynch that the term "action taken by the authorities . . . to settle disputes between members or participants" includes Exchange "action" in prescribing compulsory arbitration rules and is not limited to the actions of Exchange arbitrators in settling pre-existing disputes. See *Axelrod & Co. v. Kordich, Victor & Neufeld*, 451 F.2d 838, 841 (2d Cir. 1971); *Brown v. Gilligan, Will & Co.*, 287 F.Supp. 766, 774 & n. 18 (S.D.N.Y. 1968); 15 U.S.C. § 78c(a)(3)(26) (Supp. I 1976). But the mere fact that Ayres agreed to be bound by Exchange Rule 347(b) is not

enough to bring that Rule within the exemptive provisions of § 28(b). Under the plain language of the statute, Exchange "action . . . to settle disputes *between members or participants*" (emphasis added) is a prerequisite to application of § 28(b). Here that ingredient is missing. Exchange Rule 347(b) addresses controversies between registered representatives and member firms, not "disputes between members or participants." And it is undisputed that Ayres is not and has never been a "member of or participant in any self-regulatory organization" for purposes of § 28(b).[17]

Our construction of § 28(b) is mandated by the plain and unambiguous language of the statute. It is, as well, the interpretation suggested by the Securities and Exchange Commission, which has appeared in this case as amicus curiae. As the agency charged with the duty of administering the Securities Exchange Act and of supervising the stock exchanges' regulatory procedures, its view is to be given consideration. See, e. g. *Saxbe v. Bustos*, 419 U.S. 65, 74, 95 S.Ct. 272, 42 L.Ed.2d 231 (1974).

The only case whose holding is arguably inconsistent with the view we have taken is *Axelrod & Co. v. Kordich, Victor & Neufeld*, 451 F.2d 838 (2d Cir. 1971). But see *Newman v. Shearson, Hammill & Co.*, 383 F.Supp. 265 (W.D.Tex.1974). But the court in *Axelrod* did not discuss the question of whether § 28(b) was limited to "disputes between members" and decided the question *sub silentio*, without apparent recognition of the problem. Moreover, *Axelrod* is distinguishable on both factual and policy grounds.[18] See *Newman v. Shearson,*

---

shareholders. A means of accomplishing these purposes lay near at hand: exercising the corporation's option to call the stock of shareholders who had left the employ of Merrill Lynch through termination, retirement, or death."

The court held the option involved in that case was unenforceable.

16. Section 28(b) was amended by § 21(1) of the Securities Acts Amendments of 1975, 89 Stat. 160. Since the amendment does not affect the substance of the section in any way pertinent

to this case, we have set out the section as it presently reads.

17. See 15 U.S.C. § 78c(a)(3)(A) (Supp. I 1976) (definition of member); 15 U.S.C. § 78c(a)(3) (24) (Supp. I 1976) (definition of participant).

18. *Axelrod* involved a dispute between a member and a non-member firm. The non-member had instituted arbitration proceedings under Article VII, § 1, of the NYSE Constitution after a contract dispute had arisen. The member firm attempted to avoid the binding effect of

*Hammill & Co., supra,* 383 F.Supp. at 268–69.

For all of the foregoing reasons, including our view of the applicable federal policies, we conclude that Exchange Rule 347(b) did not require arbitration of the present controversy. Accordingly, we vacate the July 7, 1975, judgment and remand for further proceedings consistent with this opinion.[19]

STERN, District Judge (dissenting).

Percy Ayres became a registered representative with Merrill Lynch in 1945. For the next 25 years he worked as a professional dealer in securities. At the time he was hired, he agreed to submit to the jurisdiction of the New York Stock Exchange and to be bound by the rules of the Exchange and all amendments thereto. He reaffirmed that agreement in 1961, when he applied for Exchange approval to become the holder of Merrill Lynch non-voting common stock. Ayres purchased a total of 2,000 shares of Merrill Lynch in two separate transactions in January 1962 and December 1964. The total purchase price was $49,741.50. With each purchase Ayres executed a Stock Subscription Agreement under which Merrill Lynch reserved the absolute right at any time to repurchase any or all of Ayres' stock on 90-days' notice. As the majority notes, *ante* at 533, the option to repurchase was exercisable for any reason. Over the years Ayres' stock split several times, and on the date of his retirement he held 8,000 shares. Merrill Lynch exercised its repurchase option when Ayres retired on or about October 1, 1970, and required Ayres to sell his stock to Merrill Lynch for $209,064.00.

The gravamen of Ayres' claim is his allegation that Merrill Lynch withheld from him the information that it was planning to go public. Ayres contends that if the corporation had informed him of the upcoming public offering he would have decided not to retire in the hope of realizing still greater appreciation of his stock. He claims that his decision not to retire would have caused Merrill Lynch not to exercise its admittedly absolute and unqualified right to repurchase. Thus, according to Ayres, Merrill Lynch withheld from him material information in connection with his sale of stock to Merrill Lynch, in violation of Rule 10b–5.

I am unable to concur in the Court's opinion. I cannot agree that this complaint states a claim under Rule 10b–5, and I therefore find the Court's analysis of *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), inapplicable.

Congress intended, in enacting section 10(b), "to eliminate deceptive and unfair practices in security trading and to protect the public from inaccurate, incomplete and misleading information. The thrust of the Act and the decisions interpreting it is to give the investing public the opportunity to make knowing and intelligent decisions regarding the purchase or sale of securities." *Kahan v. Rosenstiel,* 424 F.2d 161; 173 (3rd Cir. 1970). *Cf. Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, 44 U.S.L.W. 4451, 4454 (1976). This Court held in *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 408 (3rd Cir. 1974):

> The test of the materiality of undisclosed or misrepresented facts is basically an objective one—i. e., whether "a reasonable man would attach importance [to

the Constitution by commencing a federal court action and seeking to rescind the contract because of alleged securities violations. Against that background the court stated at pp. 842–43 of 451 F.2d:

> "[T]he policy considerations relied on by the Supreme Court in *Wilko* are inapposite here, the Supreme Court found that the non-waiver provision there involved was designed to protect investors. 346 U.S. at 431, 74 S.Ct. 182. Without such provision, financial houses might escape statutory liability by taking advantage of the inferior bargaining

position of customers. But the legislative policy of protecting investors will not be thwarted by compelling an exchange member to arbitrate, at the instance of a nonmember, a dispute which is arbitrable under the exchange's constitution."

19. Because the arbitrators were without any jurisdiction, we reject Merrill Lynch's argument based on res judicata and collateral estoppel. See Restatement of Judgments (1942), § 7.

them] in determining his choice of action in the transaction in question." *List v. Fashion Park, Inc.*, 340 F.2d 457 (2nd Cir.), cert. denied, 382 U.S. 811 [86 S.Ct. 23, 15 L.Ed.2d 60] (1965).

The majority properly observes, *ante* at 537, n. 13, that no information can be material to the exercise of a party's choice of action if that party has no choice to make. It is the majority's view, however, that "this critical element of lack of choice on the plaintiff's part is lacking" here. *Ante*, at 537. I cannot join in this assertion. No party contends that Merrill Lynch had anything less than an unfettered right to require Ayres to sell his stock at any time on 90-days' notice. He had no right to refuse to sell. Merrill Lynch had an unconditional contractual right to buy at any time and for any reason. Thus, Ayres had no "choice of action" with regard to the sale of his stock to Merrill Lynch. I fail to see how he could have a right to any information before the sale, or how he could be prejudiced by the lack of such information.*

To the extent that Ayres had any choice to make, it was not a decision to sell securities. The decision was whether to retire or not. This decision, and this alone, was what would have been influenced by the information which Ayres claims was withheld by Merrill Lynch. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Landy v. FDIC*, 486 F.2d 139 (3rd Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). In my view any controversy concerning this decision is one "arising out of the employment or termination of employment" of Ayres with Merrill Lynch, and is governed by Exchange Rule 347(b).

The assertion in the complaint that Ayres' decision to retire amounted to a decision to sell his stock, because it influenced Merrill Lynch's decision to exercise its option to repurchase, is well answered by the Second Circuit's opinion in *Ryan v. J. Walter Thompson Co.*, 453 F.2d 444 (2nd Cir. 1971), cert. denied, 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972). In that case the court began with an observation equally apposite here:

> This case is another example of a trend we have observed with disturbing frequency, namely, the invocation of the salutary anti-fraud provisions of the federal securities laws in cases where those provisions are wholly inappropriate and wide of the Congressional mark.

453 F.2d at 445.

The court held that an employee-stockholder's lack of knowledge of his company's plans to go public, under circumstances similar to those before us, could afford him no basis for relief under Rule 10b–5:

> With respect to the Rule 10b–5 claim, the District Court held that, since Ryan was obligated to sell his shares to JWT in January 1969, whatever he knew or did not know regarding JWT's plans to go public was irrelevant. We agree. See *Fershtman v. Schectman*, 450 F.2d 1357, 1350 (2nd Cir. 1971).

452 F.2d at 447.

Under the facts alleged in this complaint, I would apply the *Ryan* rule and affirm.

For the foregoing reasons, I respectfully dissent.

---

* The majority's suggestion *ante* at 537, "that arguments can be made that Merrill Lynch's option agreement, as exercised in this case, was invalid under either federal or state law and that the information Merrill Lynch failed to disclose was therefore material" is puzzling. No such claim appears on the face of the complaint. No such claim was ever made to the district court. No such claim has been made in brief or argument to this Court.