**Thomas M. TRECKER,**
**Plaintiff-Appellant,**

v.

**Dane T. SCAG, Wisconsin Marine, Inc.,**
**and Ransomes, Sims and Jefferies,**
**Ltd., Defendants-Appellees.**

No. 81–1888.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 21, 1982.

Decided June 3, 1982.

Rehearing and Rehearing En Banc
Denied July 20, 1982.

Hugh R. Braun, Godfrey & Trump, Milwaukee, Wis., for plaintiff-appellant.

Richard S. Gibbs, Gibbs, Roper, Loots & Williams, Milwaukee, Wis., for defendants-appellees.

Before CUMMINGS, Chief Judge, SWYGERT, Senior Circuit Judge, and POSNER, Circuit Judge.

CUMMINGS, Chief Judge.

On August 30, 1979, Thomas Trecker filed a lawsuit under Section 10(b) of the 1934 Securities Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b–5 (17 C.F.R.

§ 240.10b–5). The defendants in the action were Dane T. Scag, Trecker's erstwhile business partner; Wisconsin Marine, Inc. ("WMI"), the business Trecker and Scag had founded together; and Ransomes, Sims and Jefferies, Ltd. ("Ransomes"), a British corporation that purchased a sizable interest in WMI in the summer of 1978.[1] The gravamen of Trecker's suit was that these defendants had first failed to disclose, and later misrepresented, facts that would have altered Trecker's decision to sue in state court to have his shares in WMI redeemed. According to Trecker, no sooner had he been paid $402 a share for his stock in WMI than an almost identical number of shares was sold to Ransomes for nearly four times that amount.

Judge Gordon wrote three opinions in the case. First he denied the defendants' motions to dismiss, except as to possible misrepresentations made after the entry of judgment in Trecker's state court suit. They had come too late, the judge ruled, to ground a Rule 10b–5 suit, but they might be evidence of the intent behind the defendants' earlier nondisclosure. 481 F.Supp. 861, 865 (E.D.Wis.1979). Trecker has not argued on appeal that the partial dismissal was erroneous. Later Judge Gordon granted the defendants' motion for summary judgment on the basis that Trecker's suit was time-barred, 500 F.Supp. 752 (E.D.Wis. 1980), and that the nondisclosure was neither material nor deliberate, 514 F.Supp. 364, 367–368 (E.D.Wis.1981). We vacate the grant of summary judgment on all three issues—the statute of limitations, materiality, and scienter—and remand the case to Judge Gordon for further proceedings.

### Background of the Litigation

The origin of this dispute was Trecker's and Scag's decision to go into business together in 1971. Scag contributed $150,000 and Trecker $100,000 to buy the assets of a company that manufactured snow blowers, lawnmowers, and related equipment. They issued shares in the same ratio as they had contributed capital—600 shares to Scag and 400 to Trecker. They also drafted a stock buy-back agreement: it provided for either to have his shares redeemed by the corporation in the event of his death or voluntary or involuntary departure from the company. WMI began operations in January 1972, but it could not afford to employ Trecker full-time, as the parties had contemplated. In December 1973 Trecker asked to be bought out under the terms of the agreement. Scag "accepted Trecker's request with regret" (Scag App. 112), but no action was taken—and indeed no meetings of the three-man board of directors were held—until December 1976.

In 1974 a fire damaged WMI's plant. Trecker, Scag, and their wives (who were sisters) guaranteed a $500,000 loan to rebuild. At least one of Trecker's motives was to protect his investment and restore the company to marketable condition (Trecker affidavit, Trecker App. 122). He and Scag agreed to sell the business, but their efforts in 1974, 1975, and early 1976 met with no success. In late 1975 or early 1976 the business began to prosper, and Scag changed his mind about selling. He made additional investments in the company and issued himself additional shares, diluting Trecker's interest from 40% to 34.2%.[2]

In December of 1976 the board of directors met to consider Trecker's renewed demand to be bought out and rejected it. Though WMI's plight had improved since 1973, it still had no cash to finance the redemption and all its assets were pledged as collateral for loans. However, when Trecker brought suit in state court a week later, seeking specific performance of the redemption agreement or the dissolution of the corporation, the company did not use its illiquidity as a defense or excuse. Instead it argued that Trecker had failed to tender

---

1. WMI became a wholly owned subsidiary of Ransomes in September 1979.

2. In Trecker's December 1976 state court suit against Scag and WMI the court found that the issuance of additional shares was a sound exercise of business judgment, opinion of 2/21/78 at 9.

his stock; that the agreement for the $500,000 rebuilding loan prohibited redemption; and that Trecker's continued participation in the business after his 1973 demand for redemption waived his rights (Trecker affidavit, Trecker App. 124). The state court ultimately found that: (1) Trecker had a right to have his stock redeemed and was entitled to specific performance (opinion of February 21, 1978); (2) his shares should be valued as of December 31, 1976, the end of the quarter closest to his 1976 demand (opinion of May 17, 1978); and (3) the company would be allowed to pay the money ($160,845 for the stock and $5,026 in interest) in three installments extending from May 23, 1978 to October 1979, to ease its cash-flow problems (id.). Judgment was entered on May 23, 1978.[3]

Meanwhile, while the state court action was pending Scag had initiated negotiations to sell WMI to Ransomes, a British firm with which WMI already had a distributorship agreement. Scag asserted, and the state and federal judges both believed, that he had taken this step because he anticipated that WMI would lose the state court action and need funds to pay Trecker. Scag wrote to Ransomes' management in December 1977, visited Ransomes' headquarters in Ipswich, England, in late January of 1978, and signed a letter of intent on February 24, 1978, just three days after the first state court decision. The final terms of the Ransomes-WMI deal, which were hammered out in the spring of 1978, were as follows:

(1) Trecker's stock must be fully redeemed as a pre-condition.

(2) Ransomes would pay $124,176 toward the expenses of the redemption and make a $500,000 contribution to WMI capital; it would receive shares equalling a 34.1% interest in WMI, and no additional shares would be issued to dilute its interest.

(3) By September 1979 Ransomes would either exercise an option to acquire the balance of WMI's shares or cancel the deal and have its entire $624,176 refunded.

(4) Scag would remain as president of WMI for five years.

The parties disagree about whether Trecker had any right to know about these terms or the negotiations that preceded them, and they disagree, as we shall see, about the meaning of term (2). But it is undisputed that Trecker, who remained a nominal member of WMI's board of directors until the May 1978 state court judgment, had no actual knowledge of the negotiations or their great promise for WMI until after his state court action was over.

On June 16, 1978, Scag informed the state court that he had found an "investor" who wanted to buy virtually all WMI's stock, and Scag sought permission to prepay the judgment that had been scheduled in installments less than a month earlier. A hearing was held on June 26, and Trecker objected vigorously to this whole turn of events. Although Scag's attorney had offered to let Trecker see the Ransomes contract before the hearing, provided no disclosure of the terms was made, Trecker's lawyer had declined the offer for fear that acceptance would create a waiver or estoppel against Trecker.[4] Scag's attorney also resisted any disclosure of the contract terms to the state court judge, even in camera,[5] arguing that the only issue before the court was Scag's prepayment request, and that the future prospects of WMI were outside the scope of the hearing. Trecker countered that the agreement was highly rele-

---

3. Trecker appealed the valuation question to the state appellate court, where it was sustained by a 2–1 vote; leave to appeal to the state supreme court was denied.

4. It is not entirely clear that this fear was well-grounded, but it is certainly understandable. *Timeo Danaos et dona ferentes.*

5. It is interesting to note that Scag was much more concerned with preserving the confidentiality of the contract than Ransomes was. The record shows that Ransomes had proposed announcing the transaction publicly in March of 1978 but Scag had demurred. Scag had approved a press release by Ransomes on June 12, 1978, two weeks before the state court hearing.

vant to his contention, then awaiting review in the Wisconsin appellate court, that his stock should be valued as of the actual tender: the agreement would, he said, furnish excellent evidence of what the stock was in fact worth. Throughout the proceedings the defendants characterized the Ransomes deal as unrelated to the Trecker redemption, except in the sense that Ransomes wanted the Trecker dispute cleared away. Trecker, on the other hand, suspected that the sale had been put off until he was locked into the redemption action, so that his shares could be sold to Ransomes for substantially more than he would be paid for them. But so long as the deal consisted of a $500,000 contribution to capital and only $124,176 paid for the shares (which was Trecker's understanding of contract term (2) supra), he felt stymied: he was slated to receive some $160,000 from WMI and therefore could demonstrate no harm from the $124,000 sale. After a protracted and acrimonious hearing, the state court judge granted Scag's motion to alter the payment terms and refused Trecker's request to inquire into the terms of the Ransomes contract.[6] The judge reasoned that Trecker had become a creditor, rather than a shareholder, of WMI in December 1976 and that he was therefore owed a debt, not a share in WMI's rising fortunes. WMI's liability to Trecker ($160,845.13 plus interest) was paid on June 28, 1978, and the Trecker shares released from escrow. Ransomes made its payments on June 30, 1978, and exercised its option to acquire the balance of WMI stock in September 1979.

After the conclusion of the state trial court proceedings, Trecker continued to try to ascertain the terms of the Ransomes-WMI contract. Various inquiries in the business and brokerage communities were unproductive. Trecker finally purchased 100 shares of Ransomes stock in December 1978 in order to obtain the company's annual report. When he finally received the report in July 1979, it listed the acquisition of a 34.2% interest in WMI, at a cost of $624,176, as one of the company's 1978 transactions. Viewing this as the confirmation he needed, Trecker filed his Rule 10b–5 suit in federal court on August 30, 1979.

### The Statute of Limitations

■ In suits brought under Section 10(b) and Rule 10b–5 state statutes of limitations are incorporated as the content of federal common law, Morgan v. Koch, 419 F.2d 993, 996–997 (7th Cir. 1969), but federal principles of equitable tolling determine when a limitations period begins to run, Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743. In a typical case, the Rule 10b–5 plaintiff will have, e.g., three years within which to sue, but concealment or ignorance of the violation can extend the time period. The applicable Wisconsin statute is somewhat different:

> No action shall be maintained under this section unless commenced before the expiration of three years after the act or transaction constituting the violation or the expiration of one year after the discovery of the facts constituting a violation, whichever first expires * * * (emphasis supplied). Wis.Stat.Ann. 551.59(5)

Here federal tolling doctrines are applicable at two points. They may extend the three-year period, even though the Wisconsin statute makes that an absolute limitation. Or they may supply a federal gloss to the term "discovery" in the foregoing alternate limitation.[7] It is the latter function that is

---

**6.** This decision, too, was a ground of Trecker's appeal to the Wisconsin Court of Appeals. It was not discussed in the appellate court opinion. See n. 3 supra.

**7.** The parties and the district judge have relied on the discussion of "discovery" in Cahill v. Ernst & Ernst, 448 F.Supp. 84 (E.D.Wis.1978), vacated on other grounds by unpublished order, 588 F.2d 835 (7th Cir. 1978). There Judge Warren argued that federal tolling doctrines had no application to a "discovery" statute, and could not be invoked to extend the time limit once a party had discovered the wrong. We take this opportunity to add some clarification. Ordinarily the facts that indicate discovery will also indicate that federal tolling is inapplicable. However, should the state law defining discovery be more stringent than the comparable federal tolling doctrines, the latter would govern by operation of the Supremacy Clause. Furthermore, although a plaintiff who has once discovered his cause of action cannot

important in this case, because Trecker's suit is concededly governed by the second, rather than the first, prong of the Wisconsin statute.

The statutory language necessitates two inquiries: what is the violation and when was it discovered? The district judge defined the violation as the failure to disclose negotiations with Ransomes before the final judgment (May 17, 1978) in the state court action. 500 F.Supp. at 754. We agree. Trecker has argued, in the district court and here, that the violation did not occur until September of 1979, when Ransomes lost its ability to rescind the entire transaction. But the Rule 10b–5 suit was filed in August of 1979, and it would be anomalous to treat the violation as postdating the complaint.

The more difficult question is when the violation was discovered. The district judge granted summary judgment on the limitations issue because he was persuaded that Trecker knew that he had a cause of action under Rule 10b–5 at least as of the state court hearing on June 26, 1978. The August 1979 suit would be untimely on that view. Trecker insists that he first knew enough about the transaction to sue when he obtained Ransomes' annual report in July of 1979, and that his suit was filed well within the limitations period.

At the heart of the disagreement between the district judge and Trecker is the significance to be attached to what the defendants said at the state court hearing. Trecker maintains that he thought—and the defendants wanted him to think—that Ransomes was paying only $124,176 for the stock, and that the $500,000 was either a separate contribution to capital or, in view of the escape clause in the agreement, a loan. The district judge, on rereading the transcript of the hearing, concluded that the defendants had never represented the

stock price as $124,176, and that Trecker knew that Ransomes was paying more for its shares than Trecker was receiving for his.[8]

We can readily understand that resolving this issue early in the litigation seemed like a sound way to proceed. But to decide it, the district judge necessarily went beyond the bounds of a summary judgment motion—resolving some material fact issues and failing to give Trecker, the nonmovant, the benefit of any doubts. In fact there is a substantial possibility that, with some further development of the record, summary judgment for Trecker on the limitations question would be appropriate.

■ The transcript of the hearing does not permit the degree of certainty the district judge had. The affidavit Scag had filed with his request for the prepayment hearing mentions only the $124,176 figure. It makes no reference to contributions to capital in any amount. During the hearing, the defendants refused to furnish a copy of the agreement, and Scag, who had negotiated it, was not present to clarify matters. Mr. Prieve, the third director of WMI, and Mr. Koch, Scag's lawyer, were extremely vague about the terms of the agreement. They described it variously as a plan to "help[ ] us resolve our financial difficulties" (Tr. 386); an agreement that required the redemption of Trecker's stock as a precondition (id.); a plan whereby Scag would mortgage his home for $40,000 and "then * * * [WMI] with the consent of the bank is going to be permitted to come up with the other $120,000" on the strength of the promised cash from Ransomes (Tr. 386–387); a deal wherein Ransomes was "going to pay the additional $124,000 and an additional $500,000 of working capital" (Tr. 388); a deal that was set out in all its essentials in the (skimpy) Scag affidavit (Tr. 400); a deal that required "delivery" of

---

rely on later misrepresentations to toll the statute, there could certainly be situations in which a defendant's conduct would estop him to claim the benefits of a statute of limitations.

8. The defendants insist that Trecker's shares were not sold to Ransomes: instead they were

redeemed by the corporation, cancelled, and a virtually identical number of new shares issued to Ransomes. Br. 22. This formalistic distinction does not put the transaction beyond the reach of Rule 10b–5.

Trecker's stock (Tr. 410); and a "contract that [we're] going to have $625,000 poured into this company" (Tr. 420). What all of these representations have in common is how much less pellucid they are than Ransomes' own description in the contract itself:

> 1.1 At the Closing * * * Ransomes shall purchase and WMI shall issue to Ransomes [423] shares of its common stock (equivalent to 34.1% of the shares outstanding after the Closing) in consideration of the payment by Ransomes of [$624,176] therefor.

A record like this does not permit the legal conclusion that Trecker knew what was going on on June 26, 1978 at the state court prepayment hearing. In addition, the premature decision of the district court foreclosed it from considering another factor that might have rendered anything short of actual, documented knowledge insufficient to start the statute of limitations running at that point. As this Court observed in *Tomera v. Galt*, 511 F.2d 504, 510 (7th Cir. 1975) (emphasis added), there are strong and weak forms of the federal tolling doctrine:

> At least two types of fraudulent concealment toll a statutory period. * * * In the first type, the most common, the fraud goes undiscovered even though the defendant after commission of the wrong does nothing to conceal it and the plaintiff has diligently inquired into its circumstances. The plaintiff's due diligence is essential here. [Citations omitted.] In the second type, the fraud goes undiscovered because the defendant has taken positive steps after the commission of the fraud to keep it concealed. [Citations omitted.] This type of fraudulent concealment tolls the limitations period until *actual* discovery by the plaintiff.

The district judge assumed that he was dealing with the commoner type of fraud (if indeed there was fraud at all), so that Trecker should have sued on the basis of his suspicions in June of 1978 and his efforts to find out more about the sale were too little and too late. But it is possible—and on the record as it stands not yet determinable—that the defendants engaged in the second, rarer form of fraudulent concealment, first by hiding the negotiations, then by throwing up a smokescreen about the contract terms at the June state court hearing, and finally by continuing to misrepresent the deal in their brief to the Wisconsin Court of Appeals.[9] If so, the statute of limitations would not have begun to run until Trecker actually had the Ransomes annual report in his hands in July of 1979.[10]

## Materiality and Scienter

■ In his final opinion, 514 F.Supp. 364, 367–368, Judge Gordon added a second reason for granting the defendants' summary judgment motion: the action of the defendants could not "hav[e] significantly altered

---

9. In their appellate brief in the state court, the defendants described the transaction as follows:

> Trecker claims that his stock was sold to a third party and the value it was sold for should have been considered by the court.
> The fact is that Trecker's stock amounting to 34% of the corporation was redeemed by the corporation for the amount of the judgment. The new investor acquired stock from the corporation so as to give them 34% of the stock of Wisconsin Marine Inc. The amount paid by the investor for said stock was $124,176. * * * In order to complete the transaction Scag had to pay into the corporation the difference between the $124,176 and the amount actually paid for Trecker's stock. The investor made an additional interim investment in the corporation and obtained an option to buy Scag's stock ac-

cording to a complicated formula depending on profits for an amount not less than the June 30, 1978 book value of Scag's stock, the book value being determined after redemption of Trecker's stock but not taking into consideration any advance by the investor. It will be noted that this description uses the $124,176 figure, incorporates the argument of note 8 *supra*, and does not specify that the "additional interim investment" was $500,000, paid at the same time as the stock transfer.

10. It is also conceivable that Trecker could have discovered the violation in June of 1978, but that the statement in the defendants' May 1979 brief to the Wisconsin Court of Appeals, viewed as egregiously misleading, could create an estoppel of the sort described in note 7 *supra*.

the 'total mix' of information" on which Trecker based his investment (or disinvestment) decision. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757. Therefore the materiality requirement of Rule 10b–5 was not satisfied. Furthermore scienter could not be shown, as required in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668. As the district judge saw it, the chronology destroyed any possible causal connection: Trecker had made his decision when he sued in state court, and Scag did not open negotiations with Ransomes until a year later; Trecker's rights under the redemption agreement had been adjudged on February 21, 1978, three days before Scag signed the letter of intent with Ransomes.[11]

We cannot resolve this issue, nor could the district court, as matters stand. We can perhaps focus it before remand, however. Trecker cannot be arguing that the sale to Ransomes should, without more, have increased his recovery in the redemption suit. His contractual right to redeem was governed by state law under *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480. He made an unsuccessful argument in the state trial and appellate courts that his shares should have been valued as of the time he turned them

over to WMI, rather than as of the filing of the suit, and under that argument Ransomes' willingness to pay $625,000 might have had some evidentiary value. Trecker lost on that point, however, and he cannot relitigate it in the Rule 10b–5 suit. Nor is Trecker's Rule 10b–5 action based on a contention that he should have been able to undo the redemption action, after the entry of judgment, based on what he learned at the June 26, 1978, state court hearing. Judge Gordon dismissed that part of Trecker's complaint initially, and the partial dismissal is not challenged on appeal.[12] All that Trecker can now be saying in this Rule 10b–5 action is that if he had known of Ransomes' negotiations during the pendency of his redemption suit, he would have abandoned it and held on to his shares. If Trecker could have done that, then neither materiality nor scienter is precluded and he has stated a claim under Rule 10b–5.[13] The defendants conceded as much at oral argument.

At trial Trecker argued that such a course was open to him. The defendants were able to offer nothing to controvert his assertion, although they did point out that under Wisconsin law a complaint can be dismissed after it has been answered only by leave of the court.[14] Br. 15–16. The

---

11. The district court's opinion does not explain why the February 21, 1978, decision is given such importance. Valuation and payment issues remained open until the court's May 17, 1978, opinion, and final judgment was not entered until May 23, 1978.

12. Trecker has filed a motion to reopen the state trial court proceedings on grounds of fraud. The trial court's denial of that motion is now on appeal. It is of course possible that Trecker could have been defrauded in bringing his redemption action (or in persevering with it), even if the court was not defrauded in its decision. In the event that Trecker prevailed on both his state court attack on the redemption action and his federal suit for securities fraud, his damages could be adjusted to prevent a double recovery.

13. That is the lesson of *Ayres v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 538 F.2d 532 (3d Cir. 1976), certiorari denied, 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619. There Ayres had been obligated to sell his Merrill Lynch stock to

the company on his retirement. Merrill Lynch argued that its failure to disclose a planned public offering was not material, because Ayres had no choice but to surrender his stock. The Third Circuit disagreed: although Ayres had to surrender the stock if he retired, he might have postponed his retirement had Merrill Lynch made proper disclosure.

14. The defendants did argue that a state court finding—that Trecker had become a creditor rather than a shareholder of WMI as of his 1976 redemption demand—amounted to a decision that his election was irrevocable then, and that this finding should be given collateral estoppel effect in the federal litigation. The district court correctly rejected that contention, 500 F.Supp. at 753. The state court was only concerned with choosing an appropriate valuation date, not with whether Trecker could have changed his mind about the lawsuit. The defendants also base an argument that the federal court lacked subject matter jurisdiction, because no security was involved, on the same

district judge made no findings on this issue. At first (500 F.Supp. at 754) he ruled in Trecker's favor on this point; later and without explanation (514 F.Supp. at 368) he changed his mind. The defendants were not entitled to summary judgment on that basis. We regret further complications in an already protracted and internecine struggle, but the case should not have been resolved, and on remand cannot go forward, without an adequate development by the parties of this important aspect of Wisconsin law.

The summary judgment for defendants is vacated and the case remanded for further proceedings. Circuit Rule 18 shall not apply. Costs to appellant.

POSNER, Circuit Judge, concurring.

I join Chief Judge Cummings' excellent opinion without reservations, and write separately only to express my doubts whether this case really belongs in the federal courts. I do not mean that we do not have jurisdiction; I mean that perhaps we should not have jurisdiction.

The dispute out of which this case arises is local. Wisconsin is the home of Messrs. Scag and Trecker and of their corporation, Wisconsin Marine, Inc.—the home, that is to say, of all the disputants except Ransomes, which while named as a defendant is not accused of any wrongdoing. And Wisconsin Marine is a closely held corporation. Its stock is not traded on any organized exchange—in fact is not freely traded at all. The basis of federal jurisdiction over the lawsuit is Scag's use of the mails in his dealings with Ransomes, but the federal government has no substantive interest in local transactions just because the parties happen to send letters to each other. The theory of the suit is that Scag defrauded Trecker by failing to inform him of the deal with Ransomes (which showed that Trecker's stock was worth more than Trecker knew), thereby inducing Trecker to redeem his stock for less than its true worth. This is common law fraud, a matter traditionally of state rather than federal law—but any-

way Wisconsin has a statute similar to Rule 10b–5. Wis.Stat.Ann. § 189.18. Moreover, as in so many Rule 10b–5 cases, the legal issues on this appeal are issues of, or entwined with, state law: whether Trecker could under Wisconsin law have abandoned his redemption suit if he had known of the negotiations with Ransomes (as Chief Judge Cummings' opinion explains, unless Trecker could have abandoned the suit Scag's failure to inform him of the deal with Ransomes could not have been a material omission); and whether Wisconsin's statute of limitations, which governs this Rule 10b–5 private action because there is no applicable federal statute of limitations, has run.

If I thought Congress really wanted the federal courts to decide lawsuits of this sort, involving primarily local law applied to local disputes between local residents, I would bow to its desire without protest, for there is no constitutional obstacle to federal jurisdiction. But I cannot believe that this consequence was intended when Congress enacted section 10(b) of the Securities Exchange Act of 1934. Section 10(b) makes it unlawful to use the mails "To use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). This grant of rulemaking authority was taken up in 1942 when the SEC issued Rule 10b–5, which defines the term "deceptive device" to include "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. The Securities Exchange Act does not expressly create a private right of action for violations of rules promulgated under section 10(b), but the courts early on implied a right of action and the Supreme Court confirmed it in a footnote in *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9, 92 S.Ct. 165, 169 n.9, 30

misreading of the state court language. Br. 17–19.

L.Ed.2d 128 (1971). And so we arrive at federal jurisdiction in a case such as the present, a garden-variety squabble among shareholders in a closely held corporation, which could not even be maintained as a diversity action because of the lack of complete diversity among the parties.

Rule 10b–5 was defensible as a catch-all prohibition of deceptive devices when the enforcement of the rule was confined to the SEC. Like every other government agency, the SEC has a limited budget, which prevents it from bringing anything like all the cases that are within the potential reach of the statutes and rules that it enforces. But no budget constraint limits private damage actions; such an action will be brought so long as the expected damages exceed, however slightly, the expected cost of the litigation to the plaintiff. The SEC's budget constraint, which probably would deter it from enforcing Rule 10b–5 in cases where state remedies are adequate, ceased to constrain Rule 10b–5 actions when the courts authorized private actions.

The resulting displacement of state substantive law and state court jurisdiction in an area remote from any federal concern that might arise from federal regulation of the securities markets could not have been foreseen by the framers of the Securities Exchange Act. Cf. *Hundahl v. United Benefit Life Ins. Co.*, 465 F.Supp. 1349, 1362–63 (N.D.Tex.1979). But there is little if anything that the lower federal courts can do to arrest or retard the unintended federalization of corporation law by Rule 10b–5. In *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court put some brakes on Rule 10b–5 actions by confining the concept of fraud, in the statute and the rule, to deception; unfairness is no longer enough. But as the present case, in common with many other cases decided after *Green*, such as *Wright v. Heizer Corp.*, 560 F.2d 236 (7th Cir. 1977), illustrates, the fact that deception is shown, while enough to bring Rule 10b–5 into play, does not turn a spat between two shareholders of a closely held corporation into a "federal case" in any real sense. And although *Green* is not the only

limiting interpretation of Rule 10b–5 that has been made—see *Chiarella v. United States*, 445 U.S. 222, 247, 100 S.Ct. 1108, 1124, 63 L.Ed.2d 348 (1980) (Blackmun, J., dissenting), for a list of others—it is hard to see how a rule that applies to "the purchase or sale of any security" could be judicially amended to read "the purchase or sale of any publicly traded security."

True, under the approach the Supreme Court now uses to decide whether a federal statute creates an implied right of action, it is clear that Rule 10b–5 does not. See *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). But *Bankers Life* has apparently been "grandfathered," see *id.* at 577–78 n.19, 99 S.Ct. at 2489–2490 n.19; and although the grant of certiorari in *Herman & MacLean v. Huddleston*, —— U.S. ——, 102 S.Ct. 1766, 72 L.Ed.2d 173 (1982), suggests that the Court may be willing to reexamine the *Bankers Life* footnote, the Seventh Circuit cannot do so. So we have and cannot renounce jurisdiction in this case, even though our jurisdiction is the unintended result of administrative and judicial actions that have pushed the federal courts into an area that a proper conception of federalism would assign to state legislatures and judges.

I note that an alternative theory for Trecker to a Rule 10b–5 violation was abuse by Scag of his positions as majority shareholder, director, and officer, which created fiduciary obligations on his part toward the plaintiff that Scag, it may be argued, breached. I do not want to prejudge the plaintiff's rights under Wisconsin law, cf. *Barber v. Kilbourn*, 16 Wis. 485 (1863); *Haywood v. Lincoln Lumber Co.*, 64 Wis. 639, 26 N.W. 184 (1885); *Thomsen v. Olson*, 219 Wis. 145, 262 N.W. 601 (1935), but only to point out that he might actually get more complete relief in a suit under Wisconsin law than in this federal suit. True, he could have joined a state law claim with his federal claim under the doctrine of pendent jurisdiction; but since the exercise of pendent jurisdiction is discretionary, he could not have been sure that the federal

court would retain a state law claim. See *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

When asked at the oral argument of this appeal why he had not brought this suit in state court, plaintiff's counsel stated that there were no cases under Wisconsin's counterpart to Rule 10b–5—all the case development had been federal. This just shows that the expansion of federal jurisdiction under Rule 10b–5, an expansion barely checked by decisions such as *Green*, has stultified the development of state law in an area where there is no reason to displace state by federal authority. This is not what Congress intended to happen when it enacted section 10(b) in 1934; I regret that we cannot enforce its actual intentions.